IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SARA JUDITH GARCIA GALDAMEZ, | ) | |
| JORGE ARMANDO ESCOBAR BARILLAS, | ) | |
| AND | ) | |
| VIRGINIA DE JESUS PEÑA POZUELOS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15-cv-01605 |
| | ) | |
| I.Q. DATA INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT I.Q. DATA INTERNATIONAL, INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

I.Q. Data International, Inc. ("IQ Data"), by counsel, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, states as follows for its Memorandum in Support of its Motion to Dismiss the Complaint filed against it by Sara Judith Garcia Galdamez, Jorge Armando Escobar Barillas, and Virginia de Jesus Peña Pozuelos (collectively, "Plaintiffs"):

## I.      INTRODUCTION

Plaintiffs base their Complaint asserting claims for violations of Fair Debt Collection Practices Act (the "FDCPA") on the incorrect premise that IQ Data could not lawfully collect interest on unpaid rent that Plaintiffs owed pursuant to a residential lease. Plaintiffs contend that neither the lease nor Virginia law entitles IQ Data to collect such interest. Plaintiffs are wrong. Virginia law entitles a landlord to collect interest on unpaid rent as an incident of the tenant's breach of contract. Accordingly, Plaintiffs fail to state a claim upon which relief can be granted.[1]

---

[1] IQ Data's Motion to Dismiss is limited to the threshold legal question that Plaintiffs present: whether Virginia law entitles IQ Data to collect interest on Plaintiffs' debt. Resolving that question of law in IQ Data's favor disposes of the bulk of Plaintiffs' two claims. The remaining

This Court, therefore, should grant IQ Data's Motion to Dismiss to the extent that Plaintiffs' Complaint is premised on the flawed legal theory that IQ Data was not entitled to seek interest as a result of Plaintiffs' breach of their lease to pay a sum certain by the time specified in the lease.

## II.  ALLEGATIONS IN THE COMPLAINT

Plaintiffs allege that they entered into a residential apartment lease with Fairmont Residential, LLC ("Fairmont") on May 11, 2012. Compl. ¶¶ 4-6, ECF No. 1. They allege that they "voluntarily moved out of" their leased apartment on June 10, 2015, "because their lease ended," at which point they "turned over possession of the apartment to the landlord." *Id.* ¶ 8. Plaintiffs allege that Fairmont "contended that they left behind an unpaid balance of $3,276.84, which allegedly consisted of a certain amount of unpaid rent, a certain amount of unpaid utility bills, and charges for repair of some alleged minor damages to the apartment." *Id.* ¶ 9.

Plaintiffs' account was assigned to IQ Data for collections. *Id.* ¶ 13. IQ Data sent Plaintiffs "a collection letter" on July 17, 2015, which is attach to the Complaint as Exhibit A (the "Letter"). *Id.* ¶ 14. Plaintiffs allege that the Letter "states 'Interest Due' of $19.93, and furthermore states, 'Your unpaid principal balance will accrue interest as [sic] a rate of 006.00 percent per annum.'" *Id.* ¶ 15.

Plaintiffs assert "there was no interest due, and no interest accruing." *Id.* ¶ 16. Indeed, Plaintiffs allege that the Lease "did not provide for interest charges on unpaid balances," but instead, "provides *only* for a one-time late fee on purported unpaid balances." *Id.* ¶ 11 (emphasis in original). Plaintiffs further allege that "Virginia law governing landlord-tenant relations does not automatically provide for interest on unpaid balances, *except* where a landlord has obtained a

---

portions present questions of fact regarding the exact amount of interest charged compared to the amount properly accrued, which factual issues are not properly resolved at this juncture. IQ Data's Motion, therefore, does not encompass the foregoing factual questions.

judgment against a tenant . . . ." *Id.* ¶ 17 (emphasis in original). Alternatively, Plaintiffs allege that "even if interest were legally allowed to accrue, the collection letter falsely represented the amount of interest owed." *Id.* ¶ 21.

### III.    STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(B)(6)

"The Supreme Court has recently and sensibly declared that threshold dismissal pursuant to Rule 12(b)(6) must be granted unless the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 631, 635 (E.D.Va. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While a court considering a Rule 12(b)(6) motion must accept as true all of the factual allegations contained in a complaint, the foregoing tenet "is inapplicable to *legal* conclusions." *Global Policy Partners, LLC*, 686 F. Supp. 2d at 635 (emphasis in original) (quoting *Iqbal*, 556 U.S. at 678). Accordingly, the motion to dismiss "must be granted if the complaint does not allege a sufficient factual basis to create a plausible inference that plaintiffs are entitled to relief." *Id.*

Moreover, when assessing a motion to dismiss, "[t]he court may also consider a document outside the complaint if it 'was integral to and explicitly relied on in the complaint,' and there is no authenticity challenge." *Butters v. James Madison Univ.*, Civ. A. No. 5:15-cv-00015, 2015 WL 6825420, at *5 (W.D.Va. Nov. 6, 2015) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). In this instance, Plaintiffs refer and rely in their Complaint on the lease agreement they entered into with Fairmont Residential, LLC ("Fairmont") in May of 2012 (the "Lease"). *See e.g.*, Compl. ¶¶ 4-6, 11, 12, ECF No. 1. Indeed, Plaintiffs premise their claims on the allegation that the Lease "did not provide for interest charges on unpaid balances . . . the lease provides *only* for a one-time late fee on purported

3

unpaid balances." *Id.* ¶ 11 (emphasis in original). Plaintiffs, thus, erroneously contend that the Lease waives extra-contractual remedies available to Fairmont (and thus IQ Data on its behalf). Accordingly, the Lease is "integral to and explicitly relied on" in Plaintiffs' Complaint. *See Butters*, 2015 WL 6825420, at *5. The Court should, therefore, consider the Lease, attached hereto as Exhibit A, when assessing IQ Data's Motion to Dismiss.

## IV.     ARGUMENT AND AUTHORITY

A.     **UNDER VIRGINIA LAW, A LANDLORD IS ENTITLED TO COLLECT INTEREST AT THE LEGAL RATE OF 6% PER ANNUM ON UNPAID RENT THAT A TENANT OWES PURSUANT TO A RESIDENTIAL LEASE.**

In Virginia, "[r]ent *of every kind* may be recovered by distress or action . . . In any action for rent . . . *interest shall be allowed as on other contracts.*" Va. Code § 55-227 (emphasis added). The foregoing statute, which applies to residential leases,[2] makes clear that Virginia law treats leases in the same manner as other contracts generally in the specific context of a landlord's recovering unpaid rent. Critically, however, it removes any discretion associated with the award of interest in that context. Indeed, "interest *shall* be allowed" on unpaid rent due a landlord. *See id.* (emphasis added).

When dealing with "the case of a failure to comply with a contract to pay money at a stipulated time," Virginia law provides that the "measure of damages for the breach of the

---

[2] The Code of Virginia contains two Chapters that govern the rights and obligations of landlords and tenants: Chapter 13 (Landlord and Tenant); and Chapter 13.2—the Virginia Residential Landlord and Tenant Act (hereinafter, the "VRLTA"). The former speaks generally to landlord-tenant relations, whereas the latter speaks specifically to landlord-tenant rights and obligations in the context of residential lease arrangements. Yet, some overlap exists between the foregoing chapters. Section 55-227 of the Code of Virginia, which appears in Chapter 13, allows a "landlord" to collect interest on unpaid "rent *of every kind.*" *See* Va. Code § 55-227 (emphasis added). Chapter 13 defines the term "landlord" to mean, among other things, "the owner or lessor of the *dwelling unit* or the building of which such dwelling unit is a part." *Id.* § 55-225.8(A) (emphasis added). It, in turn, defines "dwelling unit" to mean "a single-family residence where one or more persons maintain a household." *Id.* Given § 55-227's broad application to "rent of every kind" and the foregoing definitions of "landlord" and "dwelling unit," § 55-227 applies to a landlord's rights with respect to rent due under a residential lease.

contract is the principal sum due, *and legal interest thereon*." *Bethel v. Salem Improvement Co.*, 25 S.E. 304, 307 (Va. 1896) (emphasis added); *see also SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N.C.*, 809 F. Supp. 2d 485, 488 (E.D.Va. 2011) (quoting *Bethel*, 25 S.E. at 307); *Potomac Power Co. v. Burchell*, 64 S.E. 982, 986 (Va. 1909) (quoting 25 S.E. at 307); *Colonna Dry Dock Co. v. Colonna*, 61 S.E. 770, 775 (Va. 1908) (quoting 25 S.E. at 307). Based on the foregoing well-established principle, interest is a component of the damages for breach of a contract "to pay money at a stipulated time." Because Virginia law treats residential leases as other contracts generally with respect to a landlord's recovering unpaid rent, interest is a mandatory component of a landlord's damages due to a tenant's breach of contract by failing to pay rent timely pursuant to Va. Code § 55-227.[3] Accordingly, as a matter of law, IQ Data was entitled to collect interest on the amounts that Plaintiffs owed under the Lease.

Moreover, by statute, "the legal rate of interest shall be implied when there is an obligation to pay interest and no express contract to pay interest at a specified rate." Va. Code

---

[3] Notably, Va. Code § 55-227 entitles IQ Data to collect interest on the entire amount of Plaintiffs' debt. Indeed, the term "rent" in Va. Code § 55-227 means "*all money*, other than a security deposit, *owed* or paid *to the landlord under the rental agreement* . . . ." Va. Code § 55-248.4 (emphasis added). Section 55-225.8 defines various terms appearing in Chapter 13 of the Code of Virginia—the Chapter in which § 55-227 appears. It provides, in pertinent part, that: "[f]or any term not expressly defined herein, terms shall have the same meaning as those defined in § 55-248.4." *Id.* § 55-225.8. The term "rent" is not defined in Va. Code § 55-225.8. Accordingly, that term is defined pursuant to the definitions provision in the VRLTA—§ 55-248.4. Section 55-248.4, in turn, defines the term "rent" as stated above. Based on the foregoing, the term "rent" in § 55-227 means "all money . . . owed . . . to the landlord under the rental agreement." *See id.* § 55-248.4. Va. Code § 55-227, thus, entitles IQ Data to collect interest on "all money" that Plaintiffs owe under the Lease. As noted above, Plaintiffs allege that their principal debt of $3,276.84 consists of unpaid rent, unpaid utility bills, and charges for damage repairs. *See* Compl. ¶ 9, ECF No. 1. Each of the foregoing components of Plaintiffs' debt constitutes an amount owed under the Lease. *See* Lease Ex. A, at 1, 2, 28. Accordingly, each of the foregoing debt components is an element of the "rent" on which IQ Data is entitled to collect interest under Va. Code § 55-227. IQ data, therefore, is entitled to collect interest on the entire amount of Plaintiffs' debt. This Memorandum refers to the amounts that Plaintiffs owe under the Lease interchangeably as Plaintiffs' "debt" and "unpaid rent."

Ann. § 6.2-301B. In Virginia, "[t]he legal rate of interest shall be an annual rate of six percent." *Id.* § 6.2-301A. IQ Data is, thus, entitled to collect, and Plaintiffs are obligated to pay, interest on Plaintiffs' unpaid debt. Because the Lease does not set forth a specific interest rate, the legal rate of interest of 6% per annum is "implied." Accordingly, the Letter properly identifies the applicable 6% interest rate.

**B.   THE LEASE DOES NOT EXPRESS AN INTENTION TO WAIVE ANY EXTRA-CONTRACTUAL REMEDIES AVAILABLE TO FAIRMONT BY STATUTE OR OTHERWISE.**

Plaintiffs allege that the Lease "did not provide for interest charges on unpaid balances," but instead "provides *only* for a one-time late fee on purported unpaid balances." Compl. ¶ 11, ECF No. 1 (emphasis in original). Plaintiffs fail to recognize that a landlord is entitled to collect interest on such amounts as a matter of Virginia law (as discussed above). Moreover, if Plaintiffs' position is that the "one-time late fee" constitutes Fairmont's exclusive remedy for their failure to make timely payments, such contention must fail.

Under Virginia law, "the remedy provided [in a contract for its breach] will be exclusive of other possible remedies [allowed by law] *only* where the language employed in the contract *clearly shows an intent that the remedy be exclusive.*" *See Bender-Miller Co. v. Thomwood Farms, Inc.*, 211 Va. 585, 588, 179 S.E.2d 636, 638 (1971) (emphasis added). Indeed, the Supreme Court of Virginia has suggested that a lessor can only waive a statutory right "expressly." *See Va. Dynamics Co. v. Payne*, 244 Va. 314, 318, 421 S.E.2d 421, 423 (1992) ("Assuming, but not deciding, that such a right could be 'contracted away,' we think that the lessor's statutorily created right to file a subsequent action for rent would have to be expressly waived."). The United States Court of Appeals for the Fourth Circuit has commented that its reading of Virginia case law suggests that "there is a presumption against excluding statutory or legal rights absent a clear waiver of such rights . . . ." *Elderberry of Weber City, LLC v. Living*

6

*Centers-Se., Inc.*, 794 F.3d 406, 413 (4th Cir. 2015) (citing *Bender-Miller Co.*, 211 Va. at 588, 179 S.E.2d at 638; *Va. Dynamics Co.*, 244 Va. at 318, 421 S.E.2d at 423). The Lease evinces no such intent.

Indeed, the Lease contains two pertinent provisions that speak to Plaintiffs' obligation to pay rent timely. In Paragraph 4, the Lease states that:

> [r]ent shall be deemed to be all monetary payments from Tenant to Landlord, under the terms of this Lease, including, but not limited to late fees. Rental payments not received by the third (3rd) day of the month for which said payment is due shall be subject to a late payment charge of ten percent (10%) of the monthly rent under this Lease.

Lease Ex. A, at 1. Additionally, the Lease contains a Rent Payment Policy addendum that reiterates the applicable late fee. It provides that "[t]he penalty for late payments is 10% of the monthly rent and this charge will be assessed after the 3rd day of each month." *Id.* at 34. The foregoing addendum further provides that "[p]ayments will first be applied to any outstanding charges, then to the current month's late charges and related fees, and lastly to the current month's rent." *Id.*

No language in the Lease suggests, let alone "clearly shows," any "intent that the [late-fee] remedy be exclusive" of the other remedies (including interest) available to Fairmont under the law. To the contrary, the late-fee provisions merely identify the amount of and circumstances under which the fee applies. They manifestly do not include any limiting language "clearly" indicating that the late-fee is Fairmont's exclusive remedy for Plaintiffs' breach of contract. The provisions certainly do not expressly waive Fairmont's statutory right to collect interest on unpaid rent provided in Va. Code § 55-227. Accordingly, the Lease does not exclude remedies available to Fairmont (and IQ Data on it behalf) under the law (including collecting interest), nor does it waive Fairmont's statutory right to collect interest.

**C.    BECAUSE IQ DATA, ON BEHALF OF FAIRMONT, IS ENTITLED TO COLLECT INTEREST ON PLAINTIFFS' UNPAID RENT, PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER THE FDCPA.**

Plaintiffs' Complaint alleges two claims against IQ Data. Plaintiffs' first claim—dubbed "Illegal Interest"—alleges that "[t]he misrepresentations" in the Letter violate §§ 1692e(2)(A), 1692e(10), and 1692f(1) of the FDCPA. Compl. ¶44, ECF No. 1. Plaintiffs' second claim— dubbed "Illegal Notice"—alleges that "[b]y including an interest provision in the paragraph of the letter to Plaintiffs setting forth their 30-day right to dispute or request verification of the debt, Defendant created a false sense of urgency that overshadowed the 30-day right to request verification" in violation of § 1692g of the FDCPA. *Id.* ¶ 47. Plaintiffs' second claim further alleges that "by including an illegal amount of interest in the collection letter . . . Defendant misrepresented the actual amount alleged to be owed by Plaintiffs as required by 15 U.S.C. §." *Id.* ¶ 48. Both of the foregoing claims hinge on Plaintiffs' erroneous contention that Virginia law prohibits a landlord from collecting interest on unpaid rent.[4]

**1.    IQ Data did not violate §§ 1692e(2)(A), 1692e(10), or 1692f(1) of the FDCPA because Virginia law entitles it to collect interest on Plaintiffs' debt.**

Regarding Plaintiffs' first claim, § 1692e of the FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the

---

[4] As noted above, IQ Data's Motion to Dismiss is limited to those portions of Plaintiffs' claims that are eliminated by resolving the threshold legal question regarding the permissibility of collecting interest, addressed in Section IV(A) of this Memorandum. Certain components of Plaintiffs' claims allege that IQ Data violated the FDCPA because the Letter allegedly misrepresented the "amount" of Plaintiffs' debt. *See* Compl. ¶¶ 21, 44, 48. These components appear to contend that the *amount of interest* charged, rather than the fact that interest was charged at all, exceeds the actual amount accrued in violation of the FDCPA. To the extent Plaintiffs claim that the Letter misrepresented the "amount" of Plaintiffs' debt in that it allegedly includes *excess* interest (rather than the fact that it includes interest at all), such contention depends on numerous factual inquiries that are not properly resolved on a motion to dismiss. But, to the extent Plaintiffs claim that the Letter misrepresented the "amount" of Plaintiffs' debt in that it includes interest, such contention is contrary to applicable Virginia law and falls within the scope of this Motion to Dismiss.

collection of any debt." 15 U.S.C.A. § 1692e. As pertinent here, "[t]he false representation of" the "amount . . . of any debt" violates the foregoing section. *See id.* § 1692e(2)(A). The same is true with respect to "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt . . . ." *See id.* §1692e(10). Moreover, § 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt." *Id.* § 1692f. Among other things, but relevant here, the following conduct violates the foregoing section: "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) *unless* such amount is expressly authorized by the agreement creating the debt *or permitted by law*." *See id.* § 1692f(1) (emphasis added).

At its core, Plaintiffs' claim that IQ Data violated the foregoing provisions is premised on their erroneous belief that Virginia law does not entitle a landlord to collect interest on unpaid rent. As addressed above, however, Virginia law expressly entitles a landlord to recover interest on unpaid amounts that a tenant owes under a residential lease. Based on the foregoing, IQ Data did not misrepresent the "amount" of Plaintiffs' debt in the Letter by attempting to collect interest on the principal sum; interest had accrued at the legal rate of 6% per annum, as properly identified in the Letter.[5] *See* Va. Code Ann § 6.2-301. For that same reason, IQ Data did not "use any false representation or deceptive means to . . . attempt to collect any debt." IQ Data simply advised Plaintiffs of the proper amount of their outstanding debt.

Moreover, because the interest that IQ Data sought to collect is "permitted by [Virginia] law," IQ Data did not violate § 1692f(1) of the FDCPA. Indeed, it is not "the case that a debt collector must generally be entitled *by judgment* to a type of relief in order for that relief to be

---

[5] Again, IQ Data's Motion to Dismiss does not encompass Plaintiffs' § 1692e(2)(A) claim to the extent Plaintiffs contend that the Letter misrepresented the "amount" of Plaintiffs' debt by allegedly including *excess* interest.

'permitted by law' within the meaning of 15 U.S.C. § 1692f(1)." *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1330 (9th Cir. 2015) (emphasis in original). "To hold that a debt collector must have a judgment in hand in order for the relief it seeks to be 'permitted by law' would lead to untenable results . . . ." *Id.* "If a prior court judgment were a *sine qua non* for relief to be 'permitted by law,' a person would not be able to file a lawsuit seeking prejudgment interest unless she had already obtained a judgment awarding prejudgment interest. Nothing in § 1692f(1) requires this Catch-22." *Id.* Virginia law entitles IQ Data to collect interest on Plaintiffs' debt and, therefore, IQ data did not violate § 1692f(1) of the FDCPA.

Based on the foregoing, Plaintiffs' first claim fails to state a claim upon which relief can be granted as a matter of law. This Court, therefore, should grant IQ Data's Motion to Dismiss.

> **2.     IQ Data did not violate § 1692g of the FDCPA because the interest provision in the Letter simply advised Plaintiffs that their outstanding debt will accrue interest as provided by Virginia law.**

Plaintiffs' second claim contains two components. First, Plaintiffs contend that IQ Data violated § 1692g because the "interest provision in the paragraph of the letter . . . created a false sense of urgency that overshadowed the 30-day right to request verification pursuant to 15 U.S.C. § 1692g." Compl. ¶ 47, ECF No. 1. Second, Plaintiffs submit that "by including an illegal amount of interest in the collection letter . . . Defendant misrepresented the actual amount alleged to be owed by Plaintiffs as required by 15 U.S.C. § 1692g(a)(1)." *Id.* ¶ 48. Plaintiffs, again, miss the mark.

Section 1692g provides, in pertinent part, that: "[a]ny collection activities and communications during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt . . . ." 15 U.S.C.A. § 1692g(b). At the outset, the Letter expressly advises Plaintiffs of their right to dispute the debt within the requisite 30-day period. Indeed, it states that "[u]nless you notify this office within 30 days after

receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid." Letter, ECF No. 1-1. Despite this express advice, Plaintiffs contend that the last sentence in the Letter—"Your outstanding principal balance will accrue interest at a rate of 006.00 percent per annum"—"overshadowed" Plaintiffs' right to dispute the debt.

Yet the foregoing statement simply advised Plaintiffs of the fact that their outstanding debt will accrue interest according to Virginia law. Advising Plaintiffs of the legal consequences of their not paying a debt cannot and does not overshadow their right to dispute the debt. *See Bryant v. Wells Fargo Bank, Nat'l Ass'n*, 861 F. Supp. 2d 646, 652 (E.D.N.C. 2012) (quoting *Weiss v. Zwicker & Assocs., P.C.*, 664 F. Supp. 2d 214, 217 (E.D.N.Y. 2009)) (emphasis added) ("[T]he only portion of the July 16, 2009 letter that could be construed as overshadowing the validation notice was the statement that the amount owed would increase if plaintiffs did not make payment within nine days. Plaintiffs do not state how a statement that appears to merely affirm the accrual of interest would overshadow the least sophisticated consumer's understanding of his right to request that a debt collector provide verification of the debt. *Any argument on this point fails because 'even the most unsophisticated consumer would understand that . . . debt accrues interest.'*"). If anything, the Letter's statement that Plaintiffs' debt will "accrue interest" accurately and fully apprises Plaintiffs of the legal realities of their debt.

As to the second component of this claim, § 1692g(a)(1) required the Letter to "contain[]" the "amount of the debt." *See* 15 U.S.C.A. § 1692g(a)(1). In this respect, Plaintiffs' claim fails to the extent that Plaintiffs contend that the Letter did not contain the proper "amount" of Plaintiffs' debt because it included interest. Indeed, as discussed throughout this Memorandum, Virginia law entitles IQ Data to collect interest on Plaintiffs' debt. The true

11

amount of Plaintiffs' debt, therefore, includes interest. But, to the extent Plaintiffs contend that the Letter did not accurately identify the "amount" of Plaintiffs' debt because it included *excess* interest, such contention relies on factual questions not properly resolved at this juncture.

Based on the foregoing, IQ Data did not violate § 1692g(b) of the FDCPA as a matter of law. The same holds with respect to Plaintiffs' § 1692g(a)(1) claim to the extent that Plaintiffs' claim is that IQ Data did not identify the proper "amount" of the debt by including interest, as opposed to allegedly including excess interest. Plaintiffs' second claim thus fails to state a claim upon which relief can be granted as a matter of law. This Court, therefore, should grant IQ Data's Motion to Dismiss.

## V.    CONCLUSION

The propriety of Plaintiffs' Complaint hinges on the erroneous view that Virginia law does not entitle a landlord to collect interest on amounts owed under a residential lease. As discussed thoroughly above, Plaintiffs are wrong: Virginia law specifically entitles a landlord to collect interest on unpaid rent as an incident of a lessee's breach of contract. Because Plaintiffs' Complaint relies on a mistaken legal presumption, Plaintiffs fail to state a claim upon which relief can be granted as a mater of law. This Court, therefore, should grant IQ Data's Motion to Dismiss and dismiss Plaintiffs' Complaint with prejudice.


Date:   February 1, 2016                 Respectfully submitted,

                                                  _____/s/_____
                                                  Charles M. Sims, Esquire (VSB No. 35845)
                                                  D. Sutton Hirschler III, Esquire (VSB No. 85596)
                                                  LeClairRyan, A Professional Corporation
                                                  919 East Main Street, Twenty Fourth Floor
                                                  Richmond, Virginia 23219
                                                  Telephone:   (804) 343-5091
                                                  Facsimile:   (804) 783-7655

Charles.Sims@leclairryan.com
Sutton.Hirschler@leclairryan.com
*Counsel for Defendant IQ Data International, Inc.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on the 1st Day of February, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Simon Y. Sandoval-Moshenberg (VSB No. 77110)
Legal Aid Justice Center
6066 Leesburg Pike, Suite 520
Falls Church, Virginia 22041
Phone:      (703) 720-5605
Fax:         (703) 778-3454
simon@justice4all.org

Brenda Castañeda (VSB No. 72809)
Kim Rolla (VSB No. 85625)
Legal Aid Justice Center
1000 Preston Avenue, Suite A
Charlottesville, Virginia 22903
Phone:      (434) 977-0553
Fax:         (434) 977-0558
brenda@justice4all.org
kim@justice4all.org

Jeffrey Kaliel (CA 238293)
*Pro hac vice pending*
Tycko & Zavareei, LLP
1828 L Street NW, Suite 1000
Washington, DC 20036
Phone:      (202) 973-0900
Fax:         (202) 973-0950
jkaliel@tzlegal.com

*Counsel for Plaintiffs*

_____/s/_____
Charles M. Sims, Esquire (VSB No. 35845)
D. Sutton Hirschler III, Esquire (VSB No. 85596)
LeClairRyan, A Professional Corporation
919 East Main Street, Twenty Fourth Floor
Richmond, Virginia  23219
Telephone:  (804) 343-5091
Facsimile:   (804) 783-7655

14

<u>Charles.Sims@leclairryan.com</u>
<u>Sutton.Hirschler@leclairryan.com</u>
*Counsel for Defendant IQ Data International, Inc.*

THE JBG COMPANIES

## LEASE AGREEMENT

1.    **LEASE.** THIS LEASE ("Lease") made and entered into as of the 08/08/2013, by and between Fairmont Residential, L.L.C. ("Landlord") of the apartment project described in Paragraph 2 below, and Juan Carlos Escobar Barillas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barillas, and Sara Judith Garcia Galdamez, jointly and severally responsible and liable, hereinafter designated as "Tenant".

2.    **LEASED PREMISES.** Landlord, in consideration of the terms and covenants hereinafter stipulated to be paid and performed by Tenant, hereby demises, lets and leases to Tenant, the following described premises known as apartment number 804 (the "Premises"), in the building known as 4213 Wadsworth Court (street address), located in Annandale, Virginia 22003 (city/state/zip), and all appurtenances thereto belonging, including any carpet, window coverings, fire extinguishers, appliances and mechanical equipment now located or later installed in the Premises, any attached patio, porch and balcony and the following described other furnishings or appurtenances: n/a.

Landlord states that the premises will be made available in a condition permitting habitation, with reasonable safety, if that is the agreement, or if that is not the agreement, the following is the agreement concerning the condition of the premises: n/a.

3.    **TERM.** The initial term of this Lease shall be 15 month(s) day(s) and shall commence on 08/11/2013 and end 11/10/2014, pursuant to the agreements, terms and conditions which are hereby agreed to by Landlord and Tenant and hereinafter set forth.

4.    **RENT.** Tenant agrees to pay rent for said Premises in consecutive monthly installments of $1,480.59 each payable in advance on the first day of each month during said term, without setoff, deduction or demand, beginning on the first day of September, said rent to be payable at the office of Landlord or at such other place as shall be designated in writing by Landlord. It is understood and agreed that Tenant is taking possession on 08/11/2013 and by not later than said date is to pay the prorated sum of $1,002.68 as rent from that date through 08/31/2013.

Further, rent shall be deemed to be all monetary payments from Tenant to Landlord, under the terms of this Lease, including, but not limited to late fees. Rental payments not received by the third (3rd) day of the month for which said payment is due shall be subject to a late payment charge of ten percent (10%) of the monthly rent under this Lease. Rent paid after the 18th day of the month shall be paid by certified check or cashier's check.

The Landlord or Agent (as defined herein) shall give the Tenant a receipt for a rent payment if the Tenant:
(1)    makes payment in cash; or
(2)    requests a receipt.

A rental payment of $150.00 payable once with the first installment of monthly rent under this Lease (and once with the first installment of monthly rent on each renewal of this Lease or upon holdover), shall be required of Tenant by Landlord for use of common areas, common services and amenities during the term of this Lease.

| JAEB | SG | VJPP | JC | **INITIAL HERE** |
|------|-----|------|-----|----------|

**Trash Service Fee.** As additional rent, Tenant shall pay to Landlord monthly, a Trash Service Fee determined as provided in the Virginia Residential Lease Addendum – Ratio Utility Billing System attached to and made a part of this Lease.

All returned checks are subject to a service charge, as additional rent, of $50.00 and will cause the assessment of the late payment charge in the event the returned check is for any rental payment. If a check is returned, thereafter payment of the rent shall be by certified check or cashier's check.

No endorsement or statement on any check, draft, or any letter or other document accompanying any check or payment of rent or other charge hereunder shall be deemed an accord and satisfaction and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such rent or pursue any other charges or remedies in this Lease. The parties agree that any sums paid by Tenant shall first be applied toward payment of accumulated late charges and other charges and fees, if any, with the balance being applied toward rent due, in the order in which it became due. Should an agreement to pay any of said charges be limited by statute, the parties agree to be bound by payment of charges to the fullest extent permissible by law. Acceptance of rent or other payments by Lessor after the effective date of any notice or action to terminate tenancy shall not be a waiver of Lessor's right or action in that regard. Placement of payments in an overnight slot, depository, mail slot, or under the door of the management office shall not be deemed as receipt by Lessor. All payments tendered by check, draft or money order shall not be deemed made until good funds are actually physically received in hand by Lessor.

5.    **SECURITY DEPOSIT.** To secure the performance by Tenant of all the terms of this Lease, Tenant has herewith deposited with JBG/Residential Management, L.L.C., as landlord's agent, ("Agent") the sum of $0.00 (the "Deposit"), which the parties agree does not exceed the equivalent of two months' rent. The Deposit shall remain with Landlord or Agent for the full and faithful performance by Tenant of each and every term and provision of this Lease to be performed by Tenant. Tenant shall be entitled to the return of the Deposit only after full compliance by Tenant with the terms and provisions of this Lease, and after Landlord has had the opportunity to inspect the Premises following the termination of this Lease and Landlord has determined that the Premises are in the condition required by Section 8 and 10. Landlord shall have no obligation to apply the Deposit to any unpaid amounts due Landlord from Tenant, but Landlord may do so at its option and Landlord's rights upon default by Tenant shall in no way be affected by the fact that Landlord may be holding the Deposit. If Tenant has defaulted under the terms of this Lease, at Landlord's option, all or part of the Deposit may also be applied against the money due Landlord as well as against damages due to breach of this Lease, damages to the Premises, common areas, major appliances or furnishings owned by Landlord, and any balance shall be refunded to Tenant. Interest shall accrue on the Deposit in accordance with applicable law. The Deposit shall begin accruing interest from the effective date of this Lease. However, no interest shall be due and payable unless the Deposit has been held by Landlord for a period exceeding thirteen (13) months after the effective date of this Lease. The Deposit, any accrued interest, and any deductions, damages and charges shall be itemized by the Landlord in a written notice given to the Tenant, together with any amount due the Tenant, within forty-five (45) days (NOTE: one (1) month in Arlington County) after termination of the tenancy and delivery of possession to Landlord. Upon request by Landlord to Tenant to vacate, or within five (5) days after receipt of notice by the Landlord of the Tenant's intent to vacate, Landlord shall make reasonable efforts to advise the Tenant of Tenant's right to be present at the Landlord's inspection of the Premises for the purpose of determining the amount of the Deposit to be returned. If Tenant desires to be present when the Landlord makes the inspection, Tenant shall so advise the Landlord in writing, and Landlord, in turn, shall notify the Tenant of the time and date of the inspection, which must be made within 72 hours of delivery of possession to Landlord. Upon completion of the inspection attended by the Tenant, the Landlord will furnish the Tenant with an itemized list of damages to the Premises known to exist at the time of the inspection. Any successor in interest is liable to the Tenant for failure to return the Deposit, together with interest, as provided in this Paragraph.

Tenant shall not reduce the final rent payment by the amount of the Deposit.

| JAEB | SG | VJPP | JC | **INITIAL HERE** |
|------|-----|------|-----|----------|

6.    **UTILITIES.** Tenant also agrees to pay when due all separately metered charges, if any, including any deposits which may be required, for public utilities used in the Premises as shown by the meter or meters belonging thereto and Tenant shall maintain all such utility services to the Premises at all times. Said public utilities and other charges to be paid by Tenant shall include (check off as applicable):

**TENANT** Gas
**TENANT** Electricity
**TENANT** Water/Sewer

[Initial if applicable] Before Tenant occupies the Premises, Tenant shall promptly contact the local gas and/or electric utility(ies) (as applicable to Tenant as stated above) to establish an account in Tenant's name for the provision of gas and electric service to Tenant's Premises. Tenant shall ensure that the start date for each such account is the Tenant's move-in date and shall keep such accounts in Tenant's name at all times while this Lease remains in effect. If Tenant fails to comply with the conditions of this paragraph and Landlord is subsequently charged for utility charges attributable to Tenant's Premises, the Tenant shall be issued (and shall pay) a bill by Landlord or Landlord's Billing Provider on each occasion for all such utility charges (and all late fees and other fees) incurred by Landlord or the Billing Provider (which shall include a service charge by Landlord or the Billing Provider in the amount of up to $80.00 on each occasion); such service charge is used to reimburse Landlord for administrative and billing costs and charges of Landlord and those costs and charges assessed by the third party Billing Provider to Landlord for processing of the bill for the delinquent time period. Tenant and Landlord agree that the service charge described above is a reasonable estimate of the costs incurred or assessed.

Landlord does not provide any cable television service. Any and all telephone service for Tenant and the Premises shall be procured by and paid when due by Tenant.

7.    **USE OF PREMISES.** Tenant covenants and agrees that Tenant shall use and occupy the Premises as a residential dwelling and private residence and for no other purposes whatsoever, and certifies that the Premises shall be occupied solely by the following named individuals:

Juan Carlos Escobar Barillas

Virginia de Jesus Peña Pozuelos

Jorge Armando Escobar Barillas

Sara Judith Garcia Galdamez

Katherine Escobar

If there is to be any change in the above-named occupants of the Premises, it must be approved in advance in writing by Landlord. Tenant agrees that Tenant shall not keep any roomers, lodgers or boarders or carry on any babysitting or daycare service, trade, profession, business, school, course of instruction or entertainment or teach instrumental or

Last updated: 03/4/2012

**EXHIBIT A**

vocal music, dramatics, gymnastics or dancing in the Premises or elsewhere within the confines of the Community of which the Premises are a part ("Community"). Tenant shall not make or permit any use of the Premises which directly or indirectly is forbidden by public law, ordinance or government regulation, or which is dangerous to life, limb or property, or which will or tends to injure the reputation of the Premises, the building or the Community, or which will be offensive or obnoxious to any resident of the building or resident of the Community, or which may invalidate or increase the premium costs of any policy of insurance carried on the building or the Community or covering its operation.

Tenant will comply with all written Community Policies and Procedures (as hereinafter defined). Tenant shall not operate or permit to be operated a radio, stereo or television in any manner which might disturb other residents. TENANT SHALL NOT HARBOR ANY DOG, CAT OR OTHER ANIMAL IN THE PREMISES, IN THE BUILDING OR OTHERWISE WITHIN THE CONFINES OF THE COMMUNITY WITHOUT THE WRITTEN CONSENT OF LANDLORD. VISITING PETS ARE NOT PERMITTED.

8.    REPAIRS AND REDECORATIONS.  Excepting only ordinary wear and tear, Tenant shall, at Tenant's own expense, keep the Premises, including walls, ceilings, floors, woodwork, paint, plaster, plumbing, pipes, light fixtures (including replacement of incandescent and fluorescent bulbs and tubes), hardware, glassware and other fixtures and equipment therein or appurtenant hereto, in good order, condition and repair, in a clean and sanitary condition, and shall replace all broken and damaged items with others of the same quality with Landlord's written consent.

9.    ALTERATIONS.  Tenant shall not make any alterations or additions to the Premises without written consent of Landlord. Any modifications to the Premises, the building of which it is a part or the Community which are required to be made for Tenant or any occupant of the Premises pursuant to, or permitted at the request of Tenant or any occupant of the Premises pursuant to the Fair Housing Act, the Americans with Disabilities Act or any other federal, state or local law, or any amendment to or regulation under any of the foregoing, shall be at Tenant's sole cost and expense and shall be subject to Landlord's consent in accordance with such laws and regulations. The costs of removing such modifications and restoring the Premises, building or part of the Community to its condition prior to such modifications upon termination or expiration of this Lease shall be Tenant's obligation.

10.    CARE OF PREMISES.  Tenant is and shall be responsible and liable for any injury or damage done to the Premises or building and grounds by Tenant, Tenant's family or employees or any other occupant of the Premises or other persons whom Tenant permits to be in or about the Premises. Tenant shall pay the expense of replacing all glass broken and shall replace keys lost or broken and maintain the Premises and all equipment, furnishings and fixtures therein belonging to Landlord in such condition, order and repair as the same are at the commencement of the term or may be put in during the term, reasonable wear and tear excepted.

11.    CONDITION OF PREMISES.

(A)    Tenant has examined the Premises before signing this Lease and agrees that the Premises have been made available to Tenant in a condition permitting habitation and in good and satisfactory condition (with exceptions noted on the Move-in Inspection form). Upon the termination of this Lease, Tenant shall return the Premises and equipment and fixtures in as good condition as when Tenant took possession, ordinary wear and tear excepted. If Tenant should fail to do so, Landlord may restore the Premises and such equipment or fixtures and Tenant shall be responsible for paying the costs thereof promptly upon demand.

(B)    Simultaneously with the execution of this Lease, Tenant shall execute the Mold and Mildew Addendum which is attached to and made a part of this Lease. The Mold and Mildew Addendum shall remain in full force and effect throughout the term of this Lease and any extensions or renewals of this Lease. Failure of Tenant to comply with any provision of the Mold and Mildew Addendum shall be a material default under this Lease.

12.    LIABILITY AND HOMEOWNER TENANT INSURANCE.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS LEASE, TENANT AGREES THAT LANDLORD AND AGENT HAVE NOT IN ANY MANNER UNDERTAKEN TO PROVIDE SAFETY AND/OR SECURITY TO TENANT, TENANT'S GUESTS OR OCCUPANTS OR THEIR PROPERTY FROM INJURY, DEATH OR DAMAGE ARISING FROM THE ACTS OR OMISSIONS OF OTHER TENANTS OR OCCUPANTS OR THE COMMUNITY OR ANY OTHER PERSONS WHOMSOEVER. LANDLORD AND AGENT WILL NOT BE LIABLE TO TENANT OR TENANT'S GUESTS OR OCCUPANTS FOR ANY DAMAGES OR LOSSES TO PERSON OR PROPERTY CAUSED BY OTHER PERSONS, INCLUDING THEFT, BURGLARY, ASSAULT, VANDALISM, OR OTHER CRIMES, EXCEPT TO THE EXTENT APPLICABLE LAW PROHIBITS THE FOREGOING RELEASE OF LIABILITY OF LANDLORD. ALL PERSONAL PROPERTY PLACED BY TENANT IN ANY PORTION OF THE COMMUNITY, INCLUDING, BUT NOT LIMITED TO, TENANT'S PREMISES OR MOTOR VEHICLE, OR IN THE LAUNDRY ROOMS OR STORAGE AREAS AS AND IF PROVIDED BY LANDLORD, IS PLACED AT THE SOLE RISK OF TENANT OR THE PARTY OR PARTIES OWNING THE PERSONAL PROPERTY, AND NEITHER LANDLORD NOR AGENT WILL BE LIABLE FOR THE LOSS, DESTRUCTION, THEFT OR DAMAGE TO ANY SUCH PERSONAL PROPERTY EXCEPT IF CAUSED BY THE NEGLIGENCE OF LANDLORD OR ITS AGENTS, SERVANTS OR EMPLOYEES ACTING WITHIN THE SCOPE OF THEIR ACTUAL AUTHORITY AND EMPLOYMENT. IF ANY EMPLOYEE OF LANDLORD IS REQUESTED BY TENANT OR ANY MEMBER OF TENANT'S HOUSEHOLD TO MOVE, HANDLE OR STORE ANY ARTICLES IN THE STORAGE AREAS OR TO REMOVE ANY ARTICLES FROM THE STORAGE AREA, OR TO MOVE, PARK OR DRIVE ANY MOTOR VEHICLE PLACED IN THE PARKING AREA OR IN THE GARAGE, IF ANY, THE EMPLOYEE WILL BE DEEMED TO BE THE AGENT OF TENANT, AND NEITHER LANDLORD NOR AGENT WILL BE LIABLE FOR ANY LOSS, DAMAGE OR EXPENSE CAUSED BY THE EMPLOYEE.

LANDLORD STRONGLY ENCOURAGES TENANT TO OBTAIN AND MAINTAIN DURING THE TERM OF THIS LEASE OR ANY RENEWAL OR EXTENSION OF THIS LEASE, AT TENANT'S OWN EXPENSE AND FOR TENANT'S PROTECTION, A HOMEOWNER TENANT POLICY OF INSURANCE WHICH WILL PROVIDE COVERAGE FOR PERSONAL PROPERTY DAMAGE TO PROTECT TENANT, LANDLORD AND AGENT FROM LOSS OR DAMAGE TO PROPERTY ARISING OUT OF OR AS A RESULT OF THEFT, FIRE, VANDALISM AND MALICIOUS MISCHIEF; AND WHICH WILL FURTHER PROVIDE PERSONAL LIABILITY COVERAGE TO PROTECT TENANT, LANDLORD AND AGENT FROM CLAIMS FOR PERSONAL INJURY TO ANY PERSON INJURED IN OR ABOUT TENANT'S PREMISES. LANDLORD STRONGLY ENCOURAGES TENANT TO OBTAIN AND MAINTAIN, IF AVAILABLE, AN ENDORSEMENT TO SUCH INSURANCE POLICY WHICH WILL PROVIDE COVERAGE FOR WATER DAMAGE TO TENANT'S PROPERTY AS A RESULT OF SEWER BACKUP AND CERTAIN OTHER WATER HAZARDS NORMALLY EXCLUDED FROM HOMEOWNER TENANT POLICIES. IT IS UNDERSTOOD THAT TENANT'S PERSONAL PROPERTY IS NOT COVERED BY LANDLORD'S INSURANCE FOR ANY LOSS AND THAT LANDLORD AND AGENT ARE NOT PROVIDING FOR THE BENEFIT OF TENANT ANY TYPE OR FORM OF INSURANCE POLICY. IT IS FURTHER UNDERSTOOD THAT NEITHER LANDLORD NOR AGENT IS RESPONSIBLE FOR ANY WATER DAMAGE TO TENANT'S PROPERTY, WHETHER THE DAMAGE RESULTS FROM WATER ENTERING THE APARTMENT AS A RESULT OF RAIN, THE ROOF OR WALLS LEAKING, OR SEWER BACKUP, UNLESS CAUSED BY LANDLORD'S NEGLIGENCE OR THE NEGLIGENCE OF LANDLORD'S AGENTS, SERVANTS OR EMPLOYEES ACTING WITHIN THE SCOPE OF THEIR ACTUAL AUTHORITY AND EMPLOYMENT.

JAEB          SG          V.JPP          JC          INITIAL HERE

TENANT AGREES THAT EXISTING LOCKS AND LATCHES ARE SAFE AND ACCEPTABLE, AND LANDLORD AGREES TO MAKE NEEDED REPAIRS OF SAME UPON WRITTEN REQUEST BY TENANT.

13.    SUBLETTING OR ASSIGNMENT.  Tenant shall not assign or convey this Lease or any interest under it, or sublet the Premises or any part thereof, or permit the use or occupancy of the Premises or any part thereof by anyone other than Tenant without the advance written consent of Landlord, which consent shall be within the sole discretion of Landlord, except as may be provided in an Addendum to this Lease.

14.    RESERVED RIGHTS.  Landlord reserves the right to enter the Premises or any part thereof in order to inspect the Premises, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workmen or contractors. The Landlord may enter the Premises without consent of the Tenant in case of emergency. Except in case of emergency or if it is impractical to do so, the Landlord shall give the Tenant notice of Landlord's intent to enter and may enter only at reasonable times. Unless impractical to do so, Landlord shall give Tenant at least 24 hours notice of routine maintenance to be performed that has not been requested by the Tenant. The exercise of Reserved Rights by Landlord shall never render Landlord liable in any manner to Tenant or to any person in the Premises.

15.    STORAGE LOCKERS.  It is understood and agreed that should Landlord provide storage lockers outside the Premises to accommodate Tenant and other residents in the storage of suitcases, trunks, boxes and other personal property, the use of such storage lockers by Tenant shall be subject to such policies and procedures as Landlord may prescribe, with the express understanding that such storage space is furnished gratuitously by Landlord, and Landlord shall not be responsible in any manner whatsoever for any damages to Tenant or Tenant's property in connection with Tenant's use of such storage locker(s). In no event shall Tenant place or store in any storage locker any property or material which is a fire hazard.

16.    ABANDONMENT.  Should it reasonably appear to Landlord that Tenant has abandoned the Premises (it being agreed that Tenant's absence from the Premises for seven (7) consecutive days after rent has become due and remains unpaid or Tenant's removal of substantially all of Tenant's possessions will create a conclusive presumption of abandonment), the Premises or any part thereof may be repossessed by Landlord, pursuant to law, and relet upon terms satisfactory to Landlord, and Tenant shall be liable for any "Actual Damages" resulting there from. "Actual Damages" include (i) damages to the Premises caused by the Tenant in excess of ordinary wear and tear, (ii) damages which are the direct result of the Tenant's breach of lease, premature termination of abandonment (including, but not limited to, advertising and redecoration), and (iii) the actual rent loss, if any, experienced by the Landlord. Landlord has a duty to mitigate Actual Damages. Landlord may apply Tenant's Deposit to rectify any damage caused by Tenant's vacating or abandonment. Application of the Deposit shall not waive or limit Landlord's right to further hold Tenant liable for damages, losses or injury therein due.

JAEB          SG          V.JPP          JC          INITIAL HERE

17.    SUBORDINATION.  This Lease and all rights of the Tenant hereunder are expressly understood and agreed to be subject and subordinate in all respects to the lien of any present or future mortgage or mortgages which may be placed upon the Premises, the property or building of which it is a part, or the Community by Landlord or assigns of Landlord and to all other rights acquired by the holder of any such mortgage or mortgages. As used herein, the term "mortgage" shall mean and include the phrase "deed of trust" or term with similar meaning.

18.    QUIET ENJOYMENT.  Landlord hereby covenants with Tenant that subject to the terms, conditions and covenants herein set forth, Tenant shall peaceably enjoy and hold the Premises.

19.    POLICIES AND PROCEDURES.  Tenant shall comply with all policies and procedures now or any time hereafter adopted by Landlord as the same may be amended from time to time (the "Community Policies and Procedures"), which are posted at a conspicuous place in the Community or are brought to the notice of Tenant, both in regard to the Premises and the Community. The current Community Policies and Procedures as of the date of this Lease are attached hereto as an Addendum. Tenant further acknowledges receiving and reading a copy of said Community Policies and Procedures and agrees to abide by them.

Last updated: 03/M/2012                                                                                    2

20. **BREACH OF LEASE.** If Tenant shall fail to pay any monthly rental or other monetary sum hereunder as it becomes due or shall fail to perform or observe any other term or condition of this Lease or should Tenant be declared incompetent, become bankrupt or make a voluntary assignment for the benefit of creditors or should a receiver, guardian or trustee be appointed of Tenant's property, then and in any such event, Landlord, at Landlord's option, may re-enter and repossess the Premises pursuant to law without being liable for forcible entry, trespass or other tort, and, as Landlord elects, Landlord may perform any or all of the following: (a) declare this Lease to be terminated, in which event Tenant's rights and Landlord's duties under this Lease shall terminate without prejudice to Landlord's rights to recover unpaid rents and damages for breach of this Lease; or (b) relet the Premises on behalf of Tenant for the rent which may be reasonably attained, which event shall not be considered as a surrender or acceptance of the Premises or a termination of this Lease, and recover from Tenant any deficiency between the amount received as such upon the reletting less all costs of reletting which Landlord deems necessary or appropriate to be made in connection with the reletting and the amounts due under this Lease. Upon termination of this Lease by lapse of time or otherwise, or upon Landlord's exercise of any power to enter or repossess the Premises as described above, Tenant shall at once surrender possession of the Premises and remove each of its property therefrom as Landlord may specify in writing, and deliver to Landlord all keys to the Premises.

Failure on the part of Landlord to re-enter or repossess the Premises or to exercise any of its rights hereunder upon any default shall not preclude Landlord from the exercise of any such rights upon any subsequent defaults. The acceptance of past due rent shall in no event act as a waiver of Landlord's right to terminate this Lease for nonpayment of rents due or other default of Tenant, and no notice or demand shall be required for enforcement thereof.

21. **HOLDING OVER.** Without the prior written permission of Landlord, if Tenant retains possession of the Premises or any part thereof after termination of this Lease by lapse of time or otherwise after written notice from Landlord of Landlord's refusal to extend or renew said Lease, or after the effective date of any notice of termination of this Lease by Tenant, Tenant agrees to pay to Landlord double the monthly rent specified hereinabove.

*J̶A̶E̶B̶*      *S̶G̶*      *V̶.J̶.P̶.P̶*      *J̶C̶*      INITIAL HERE

22. **NOTICES.** All notices and demands authorized and required hereunder may be served upon Tenant in person or by U.S. Mail addressed to Tenant at the Premises. All notices or demands authorized or required to be given to Landlord may be served upon Landlord by personal delivery to Landlord or by U.S. Mail certified. The person, if any, authorized to accept notices or service of process on behalf of the Landlord is:

Name:                    Fairmont Residential, L.L.C.
Address:                 C/O JBG/Residential Management, L.L.C.
                         4445 Willard Avenue, Suite 400
                         Chevy Chase, Maryland 20815

Telephone Number: (240) 333-3606

23. **TERMINATION.** The tenancy of Tenant under this agreement may be terminated by Landlord or Tenant by either party giving written notice to the other party of the intention to terminate said tenancy at the expiration of the Lease term, such notice to be given at least sixty (60) days prior to the date of expiration, as provided under the provisions of this agreement. Rent is payable by Tenant to Landlord for said sixty (60) day period and if Tenant vacates the Premises prior to the end of said period, Tenant shall nevertheless pay rent for said 60-day period as hereinbefore provided. In no event may Tenant's move-out notice terminate the Lease sooner than the end of the Lease term or renewal period.

UNLESS ANOTHER LEASE IS SIGNED BY THE PARTIES HERETO OR UNLESS WRITTEN NOTICE OF TERMINATION OF THIS LEASE IS GIVEN BY EITHER PARTY TO THE OTHER PARTY AT LEAST TWO MONTHS PRIOR TO THE EXPIRATION OF THE TERM SET FORTH IN PARAGRAPH 3 OF THIS LEASE, THIS LEASE SHALL BE AUTOMATICALLY RENEWED FOR SUCCESSIVE PERIODS OF 60-DAYS EACH, UNDER THE SAME TERMS AND CONDITIONS AS ARE SET FORTH HEREIN, EXCEPT THAT LANDLORD RESERVES THE RIGHT TO INCREASE THE RENT FROM TIME TO TIME APPLICABLE TO ANY SUCH 60-DAY TENANCY. SUCH 60-DAY TENANCY MAY BE TERMINATED BY EITHER PARTY GIVING WRITTEN NOTICE OF TERMINATION TO THE OTHER PARTY AT LEAST 60-DAYS IN ADVANCE OF THE DATE FOR SUCH TERMINATION. IF TENANT DEFAULTS UNDER THIS LEASE, LANDLORD SHALL HAVE THE RIGHT TO PROCEED ACCORDING TO PARAGRAPH 20 OF THIS LEASE, AND IN THAT EVENT LANDLORD SHALL NOT BE REQUIRED TO GIVE TO TENANT EITHER OF THE 60-DAY NOTICES OF TERMINATION DESCRIBED ABOVE IN THIS PARAGRAPH.

*J̶A̶E̶B̶*      *S̶G̶*      *V̶.J̶.P̶.P̶*      *J̶C̶*      INITIAL HERE

24. **WATER BEDS/LIQUID-FILLED FURNITURE.** Water beds or other liquid-filled furniture are conditionally permitted, however, a copy of Tenant's current Renter's insurance Policy must be provided to the Rental Office prior to installation of such furniture, and specific written permission from Landlord is required in advance. Tenant's insurance policy must cover the Landlord, the Agent and the Community for any damage from, including, without limitation, ruptures or leaks of, the water bed or liquid-filled furniture.

25. **WINDOW COVERINGS.** Tenant understands and agrees that all window coverings will appear white to the outside of the building. This shall include blinds, drapes, or any other window treatments.

26. **LANDLORD LIABILITY.** Notwithstanding any provision to the contrary contained herein, to the extent permitted by applicable law, Tenant shall look solely to the estate and property of Landlord in and to the Premises in the event of any claim against Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises, and Tenant agrees that any liability of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises, shall be limited to such estate and property of Landlord in and to the Premises. To the extent permitted by applicable law, no properties or assets of Landlord other than the estate and property of Landlord in and to the Premises and no property owned by any partner of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other remedy of Tenant arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Premises.

27. **PET STATEMENT.** Without modifying the provisions of Section 7 hereof, Tenant shall indemnify, defend and hold Owner harmless from and against any damages, actions, claims, and suits arising from damage or injury caused to any person or property of others by any pet owned, housed or maintained by Resident.

28. **SORTING AND SEPARATION OF REFUSE AND TRASH.**

(A) Tenant's duties - Tenant agrees, at Tenant's sole cost and expense, to comply with all present and future laws, orders, and regulations of all state, federal, municipal, and local governments, departments, commissions, and boards applicable to Tenant regarding the collection, sorting, separation, and recycling of waste products, garbage, refuse, and trash. Tenant shall sort and separate such items into categories as provided by law, and in accordance with the rules and regulations adopted by Landlord for the sorting and separating of such designated recyclable materials. Tenant shall pay, together with each installment of monthly rent falling due, the Trash Service Fee (as defined in Paragraph 4 hereof) for trash service and all refuse and landfill charges incurred by Landlord for trash service to the Apartment.

(B) Fines and penalties and indemnification of Landlord - Tenant shall pay all costs, expenses, fines, penalties, or damages imposed on Landlord or Tenant by reason of Tenant's failure to comply with Paragraph (A) above, and shall indemnify, defend and hold Landlord harmless from and against any actions, claims, and suits arising from such noncompliance, using counsel reasonably satisfactory to Landlord, if Landlord so elects, to the extent permitted by applicable law. Tenant's noncompliance with Paragraphs (A) or (B) shall constitute a violation of a substantial obligation of this Lease and Landlord's rules and regulations.

29. **MILITARY TRANSFER CLAUSE.** (A) If Tenant is a member of the armed forces of the United States or a member of the National Guard serving on full-time duty or is a Civil Service technician with the National Guard, Tenant may terminate this Lease if Tenant: (i) has received permanent change of station orders to depart 35 miles or more (radius) from the location of the Premises; (ii) has received temporary duty orders in excess of three months' duration to depart 35 miles or more (radius) from the location of the Premises; (iii) is discharged or released from active duty with the armed forces of the United States or from its full-time duty or technician status with the National Guard; or (iv) is ordered to report to government-supplied quarters resulting in the forfeiture of basic allowance for quarters.

(B) In order to exercise the termination as provided for in the above section (A), Tenant must serve Landlord a written notice of termination to be effective on a date stated therein (the "Early Termination Date"). The Early Termination Date must be no less than 30 days after the first date on which the next rent payment is due after the written notice of termination is given. The Early Termination Date shall be no more than 60 days prior to the date of departure necessary to comply with the official orders or any supplemental instructions for interim training or duty prior to the transfer. Prior to the Early Termination Date, Tenant shall furnish Landlord with a copy of the official notification of the orders or a signed letter, confirming the orders, from Tenant's commanding officer.

(C) All rent payments through the Early Termination Date must be made in full at such time as such payments would have otherwise been required by the terms of this Lease. In addition, Tenant is responsible for any physical damage to the premises caused by any act or omission of Tenant, ordinary wear and tear excepted.

30. **PARAGRAPH ON ADDENDUMS.** All addenda which are attached to this Lease, unless cancelled or replaced by Landlord, are a part of this Lease and shall remain in effect for the duration of this Lease.

31. **MISCELLANEOUS.** Except as otherwise provided in this Lease, the agreements herein shall be enforceable by and against Tenant and Tenant's respective personal representatives, successors and assigns. This Lease contains the entire agreement between the parties and all prior and contemporaneous discussions and negotiations or understandings are merged herein and no statement, representation, inducement, promise or conduct whatsoever, oral or written, expressed or implied, not contained herein shall be binding on either of the parties. No subsequent amendment to this Lease shall be binding unless in writing and signed by the parties hereto. No waiver of any breach of any term of this Lease shall be construed as a waiver of that term or condition or any subsequent breach thereof. And Landlord's acceptance of any monthly rental after the due date shall not constitute a waiver of Landlord's right to receive any future monthly rental(s) on the due date. This Lease shall be construed consistently with all laws and public policies, and if any court of competent jurisdiction determines that it is impossible to so construe any provision of this Lease and consequently holds such provision to be invalid, such holding shall in no way whatsoever affect the validity of any other provision of this Lease. If this Lease is executed by more than one person or entity as Tenant, all such persons or entities shall be jointly and severally liable for the payment of the agreed rental and for the performance of all the terms and obligations required to be kept by the Tenant hereunder. When the context permits or requires, a pronoun in any gender, masculine or feminine or neuter, shall include the remaining genders and the singular the plural and the plural the singular. The remedies provided in this Lease shall be cumulative and shall not in any way abridge, modify or preclude any other rights or remedies to which Landlord is entitled at law or in equity.

**EACH PARTY ACKNOWLEDGES THAT IT HAS READ THIS LEASE PRIOR TO SIGNING AND AGREES TO ALL TERMS CONTAINED HEREIN.**

**32. COMMUNITY CLUB.** Subject to the provisions of this paragraph, the leasing of the Premises shall give Tenant and authorized occupants membership in any community club as may be established by Landlord for use by tenants of the Community of which the Premises are a part. Initial and continuing membership in any swim or other club so established by Landlord is conditioned upon Tenant not being in violation of the terms of this Lease, having paid all rent and all other obligations and at all times complying with rules and regulations applicable to such club as may be established and revised by Landlord from time to time. Tenant acknowledges receipt of a copy of the current Club Rules and Regulations (if such club exists). Membership in any such club is provided solely as an accommodation to Tenant and not as a part of the rent, and Landlord shall have no obligation to continue same. There shall be no adjustment or reduction in rent in the event that, for any reason, such club facilities are not available, regardless of the length of time such condition exists. Among other reasons, membership may also be revoked or temporarily suspended for violation of Club Rules and Regulations (notwithstanding the fact all recreational facility fees, rent and other charges may be paid in full). Security deposits may also be forfeited at the option of the Landlord as liquidated damages if Tenant fails to turn in all club cards upon termination of tenancy.

**33. REPRESENTATIONS IN APPLICATION.** The rental application submitted by Tenant, which is made a part of this Lease, has been an inducement for Landlord to rent the Premises to Tenant. If any of the representations contained in the rental application are found by Landlord to be misleading, incorrect or untrue, Landlord has the right to cancel this Lease and to repossess the Premises according to any remedy provided by law. Landlord will also have the right to recover from Tenant any loss or damages which Landlord may suffer because of such misrepresentation, including rent for the full term of the Lease.

**34. LEAD PAINT DISCLOSURE.** Landlord has provided to Tenant, and Landlord and Tenant have executed, the form "Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards" and Landlord has provided to Tenant the United States Environmental Protection Agency booklet entitled "Protect Your Family from Lead Paint in Your Home", and said form and booklet are attached to and made a part of this Lease.

<u>JAEB</u>         <u>SG</u>         <u>V.J.P.P.</u>         <u>JC</u>    INITIAL HERE

**35. ATTORNEY'S FEES.** In the event that Landlord obtains the service of an attorney and takes legal action against Tenant in connection with any breach by Tenant of any of the terms or conditions of this Lease, Tenant covenants and agrees to pay as additional rent Landlord's reasonable attorney's fees to the extent allowed by law of the Commonwealth of Virginia, plus all court costs, the costs of any special process server employed by Landlord, and all other additional costs that may be incurred, as a court or tribunal of competent jurisdiction may award, in the event that legal action is instituted against Tenant.

**A.** The Landlord and Tenant, for themselves, their respective successors, executors, heirs, administrators, and assigns, have executed this Lease as of the day and year first above written.

<u>JAEB</u>         <u>SG</u>         <u>V.J.P.P.</u>         <u>JC</u>    INITIAL HERE

Tenant:                                                   Landlord:
                                                          Fairmont Residential, L.L.C.

_____
Juan Carlos Becerra Bardles, Tenant                      By: JBG/Residential Management, L.L.C. its Agent

_____
                                                          By: JBG/Comstock Partners III, L.L.C. its Managing Member
Virginia de Jesus Peña Pozuelos, Tenant
                                                          By: _____
_____
Jorge Armando Becerra Bardles, Tenant                    Name: _____

_____                          Title:  Authorized Signatory
Sara Judith Becerra Pozuelos, Tenant



THE JBG COMPANIES

## COMMUNITY POLICIES AND PROCEDURES
### (Addendum to the Lease)

In these Policies and Procedures, the terms "you" or "your" refer to the Tenant, "Residents" refers to persons living in the Community, "Our" and "Management" refer to Fairmont Residential, L.L.C., as Agent for the owner of the Community. In order to promote and maintain this Community, and as a condition of residency, Management has established the following policies. It is required that you abide by these policies and procedures and with all policies and procedures now or hereafter promulgated by Management. Resident agrees to obey all laws and ordinances applicable to the Premises and the Community. Resident agrees that the foregoing conduct by Resident is essential for the comfort and convenience of all Community Residents.

**1.** **RENT.** All rents are due and payable on the first day of each month. Payment must be made only at the rental office of the Apartment Project (or at such other place as may be designated in writing by Landlord to Tenant) by check or money order during normal office hours. No cash will be accepted at the rental office. All checks or money orders for rent or other payments are to be made payable to "JBG/Residential Management, L.L.C." or to such other payee as Landlord may designate in writing to Tenant. Only one check in full payment of the rent will be accepted for one apartment, even though two or more persons may have signed the lease or occupy the apartment. A certified check, cashier's check or money order may be required, at Landlord's option, for payment after return of a dishonored check, or for payments made after the third (3rd) day of the month.

**2.** **SERVICE REQUESTS.** All requests for service should be made to the onsite Management at the office number provided. They will in turn relay the request in writing to Maintenance. Any plumbing leak, blockage or overflow, frozen water lines, lack of heat in winter or electrical failure should be considered as emergencies, in which case the Management should be notified immediately. Air conditioning problems will not be considered as an emergency. Our answering service will receive calls after office hours are notify Maintenance. Any expense incurred by the Management as a result of mistreatment of the apartment or common areas will, insofar as necessary, be assessed against the resident responsible. For your convenience and information, a set of instructions for the operation of appliances and mechanical equipment is available upon request. If for any reason it should be necessary to call FIRE, RESCUE or POLICE assistance, please call the emergency service directly for help rather than the Management Office (the "Office"). Notify Management immediately after calling the Police, Fire Department, etc.

**3.** **KEYS AND LOCKS; SECURITY SYSTEMS.** Alterations or replacement of locks or installation of bolts, door knockers, peepholes or other attachments on the interior or exterior of any door must be installed by Maintenance and have Management's prior approval. Installation by the Resident of any burglar alarm or security system must be approved in advance by Management and arrangements for continued access by Management and its employees to the Premises must be made. Management will admit Residents who have been locked out of their apartment during office hours. After office hours, Management will not admit Residents who have been locked out of their apartment. The Resident will have to hire and pay a locksmith approved by Management and Resident shall provide keys to the new lock to Management within 24 hours after the lock is changed. Prior to admittance, the Resident will provide Management with identification acceptable to Management.

**4.** **LIGHT BULBS.** Landlord will furnish electric light bulbs in the fixtures and fuses in the panel box installed by Landlord at the time Tenant takes possession of the apartment, but not thereafter.

**5.** **ELEVATORS.** In buildings with elevators, Moving of furniture is permitted to and from the apartments between the hours of 8:00 a.m. and 8:00 p.m. only. In addition to all other notices required under this lease, notice of intent to move must be given to the authorized representative of Landlord at least 48 hours prior to Tenant's moving date. Any packing cases, barrels or boxes which are used in moving must be removed by Tenant to whom they belong or by the moving company. Such moving company shall provide to Landlord a certificate of insurance acceptable to Management, together with the notice of intent to move from Tenant.

**6.** **WATER BEDS.** Water beds or other liquid filled furniture are not permitted in this Community, except with the prior written consent of Management in its sole and absolute discretion. In the event such consent is given, a copy of your current Renter's Insurance Policy must be provided to Management prior to installation of such furniture, and your insurance policy must cover Landlord, Management and the Community for any damage caused by the furniture, including, without limitation, from ruptures or leaks of the furniture.

**7.** **DELIVERIES AND PACKAGE ACCEPTANCE.** Management will accept deliveries for you when you are not at home, at your sole risk. Management shall not have any responsibility or liability for loss, theft or damage of any such deliveries. An Office Representative cannot accompany the delivery person to your apartment. If you authorize the delivery person to deliver item(s) to your apartment, you must provide written authorization to Management to release a key to and to admit the delivery person to your apartment. Consequently, Management does not assume any responsibility for the delivery or for theft, loss or breakage resulting from delivery or such admission of a delivery person to your apartment.

Because of limited storage space, please pick up your packages at your earliest convenience from the Office.

**8.** **GUESTS.** Guests and visiting children are welcome at our community. However, if you would like them to use our facilities, you must be with them at all times. Specifically, any child under the age of 18 requires parental or guardian supervision. Guests and visiting children should limit their stay to no more than 1 week duration per visit unless prior written Management approval has been received. You are responsible for the conduct of your visitors. Please help make their stay more enjoyable by informing them of the Community Policies and Procedures in advance.

**9.** **SUPERVISION OF CHILDREN.** All parents are responsible for their own children and are required to see that they too abide by the Community Policies and Procedures. Specific attention should be given to preventing children from playing in or around any entryways, laundry rooms, carports, trash receptacles, parking areas, garage(s), recreational facilities and ponds. Young or visiting children must be supervised by an adult resident at all times. Toys, bicycles, etc., should be stored within your apartment and not outside or in the common areas. Unattended articles will be subject to confiscation by Management at Management's discretion.

**10.** **RECREATIONAL FACILITIES.** Please check with the Office prior to using any of the recreational facilities for specific policies that govern their use. Use of such facilities is prohibited after hours posted. We cannot assume responsibility for the safety of yourself, family members or guests who use our facilities. Please adhere to all posted signage for your safety and protection. Children under the age of 18 years of age may only use recreational facilities under the supervision of a parent or guardian.

**11.** **LAKES.** If your Community has a lake, it is imperative that certain common sense guidelines be followed. Swimming, boating, fishing and ice skating are prohibited unless otherwise posted. Children under the age of 18 years of age who are in the area of the lake must be accompanied by a parent or guardian. We ask that you respect the privacy of those Tenants whose apartments are directly by the lake. Please adhere to all posted signage.

**12.** **DISTURBANCES, NOISES, ETC.** A Resident or Residents shall not make or permit any disturbing noises which will unreasonably interfere with the rights, comforts or convenience of other Residents. Residents must keep the volume of any radio, television or musical instrument in his/her apartment sufficiently low at all times so as not to disturb other Residents in the building. Residents may not conduct or permit any vocal or instrumental practice or instruction. In order to eliminate any noise caused by walking on the floors in his/her apartment, Resident must install sufficient carpeting or rugs with appropriate padding to eliminate all such noise.

**13.** **LAUNDRY ROOMS.** If Management provides common area laundry facilities, then those laundry facilities are available for the exclusive use of our Residents during the hours posted. Residents shall not permit their children to go to the laundry room unless attended by an adult. Clothes, laundry detergents, etc., should not be left unattended in the laundry areas. Please remove your laundry as soon as the machine shuts off. Management cannot be responsible for loss or damage of these articles, or any of Resident's personal property. If any problems are experienced, Resident shall immediately notify Management.

Please help us in maintaining your laundry room by disposing of lint, empty containers, softening sheets, etc. in a trash receptacle. At no time should the laundry room waste container be used for your daily accumulation of refuse nor should the facilities be used as a playroom or storage area.

**14.** **ENTRANCES, HALLWAYS, AND MECHANICAL ROOMS.** In compliance with the State and Local Fire Codes, bicycles, wagons, carts, refuse, or any other items are not to be

Last updated: 01/12/12
Community Policies and Procedures

left at the entrances or in the hallways at any time. Nothing should be stored in the mechanical rooms that contain the furnace and/or hot water heater. Management asks that all Residents give complete cooperation with this regulation. Failure to do so could result in needless damage or personal injury. The posting of flyers, notices, etc., in any location is strictly prohibited.

15.     TRASH REMOVAL SERVICE. Please wrap all refuse securely and place it inside suitable, substantial, non-leaking covered containers and place it inside the appropriate receptacle or chute. Please do not place large articles such as furniture, mattresses, etc. in these areas since the removal service will not handle these items. No trash or boxes shall be left in hallways or common areas. A $10.00 fee will be charged for removal of any items left or discarded in hallways or common areas. Boxes should be completely collapsed before disposal. If you need to dispose of fireplace ashes, please consult with the Office before doing so. Recycling is encouraged by Management and recycling bins are available for Residents' use. Please consult with the Office for specific recycling guidelines and procedures.

16.     PETS. No Resident may have or keep a pet or animal of any kind, species, or description in his/her apartment, without the prior written consent of Management in Management's sole and absolute discretion; except, however, any Resident who is totally or partially blind, or deaf or hearing impaired, may keep, in accordance with applicable laws, a dog which is certified as being specially trained to aid Resident in his/her handicap. Resident shall be liable for any damages caused by such specially trained dog, and agrees to keep the dog from disturbing other Residents in any manner. Visiting pets are not permitted at any time. Please make sure your guests are aware of this so they can make other arrangements. Pet owners must clean up after their pets and adhere to all other guidelines included in the Pet Addendum.

17.     MOTORCYCLES/MOPEDS/COMMERCIAL VEHICLES. Motorcycles and Mopeds are not permitted in this Community, except with the prior written consent of Management in Management's sole and absolute discretion. If permitted, they must be parked in areas designated by Management with a small board under the kickstand to prevent damage to the asphalt or pavement. IF RESIDENT OPERATES ANY SUCH VEHICLES, RESIDENT SHALL OBEY ALL SPEED LIMITS AND TRAFFIC LAWS AND SHALL EXERCISE EXTREME CAUTION. At no time may any gasoline powered vehicles, machinery or devices be parked inside any building or apartment, on a patio/balcony or next to a building, in an entrance way or on the sidewalks. No explosive materials or fluids are to be stored or left in the above areas (such as gasoline or fuel grade alcohol, etc.). Residents shall not operate any commercial vehicles in the Community except with the prior written consent of Management in Management's sole and absolute discretion. All permitted commercial vehicles shall park only in spaces designated by Management. No oversized vehicles shall be permitted (for example, tractor trailers, cherry pickers, excavation equipment or commercial trailers).

18.     INTERIOR ALTERATIONS. Residents shall not make any alterations such as painting, wallpapering, paneling or hanging decorative light fixtures on the interior of their apartment without first obtaining written approval from Management. If approval is given, the following general rule will apply: upon vacating the apartment, the resident must remove the improvement and restore the apartment to its original condition; or, if the outgoing resident wishes to leave the improvement and Management determines that it is acceptable, the improvement may remain in the apartment and become part of the property. Alterations not permitted include contact paper, tub adhesives, cork board, mirrored squares, non-strippable wallpaper and tape to secure wall hangings.

19.     EXTERIOR ALTERATIONS: SATELLITE DISHES. In order to maintain an attractive Community and not disturb the architectural designs that have been created, no alterations to the exterior of the building may be made by residents. The only exception will be the displaying of the American Flag on private patios and balconies only, on such days as the 4th of July, Flag Day (June 14) and other recognized dates. The means of mounting the flag must be approved by Management. Residents may not install flag mast own outside antennas, except that, only for so long as Landlord is required by law to allow Residents to do so, Residents may install satellite dishes or a traditional stick-type antenna provided that the dish (the term "dish" hereinafter includes both dish and stick-type) is mounted within the confines of the leased premises (apartment). Management has not made any representation that any Resident's apartment can receive a satellite signal. Residents living in units that can receive satellite signals who wish to install dishes must adhere to the following rules:

a.      The dish must be installed within the confines of the leased premises (apartment) or on a patio or balcony that is part of the apartment. You may not install a satellite dish in a common area or on the roof. You may not mount a dish on an outside wall, a common stairwell, the roof or eaves, or outside the windowsill. Management prohibits the drilling of any holes through the outside wall, window or brick/wood of the apartment. A dish can be securely clamped to a balcony railing, but the drilling of holes is prohibited. Management, at its discretion, may require a separate damage deposit of $100. Management requires that any dish not be a obtrusive and may require that the dish be painted a color that matches with the exterior building color or masked so long as the signal is not impaired. You may not install a dish outside your apartment unless you have a patio or balcony, and you may not install a dish on an exterior wall. You may install a dish entirely inside your apartment.

b.      The dish must not be larger than one meter in diameter. You may not install any satellite dish larger than one meter (3 feet, 3 inches), measured across its widest part.

c.      The dish must be securely mounted and may not extend beyond the edge of the apartment. Your dish must be mounted in such a manner that it cannot become dislodged. It must not extend beyond the edge of the patio or balcony railing. You may not hang a dish out the window.

d.      Installation of the dish must not damage the apartment. You may not drill holes in railings, exterior walls, or any other location where holes might impair the building's weatherproofing or there is a risk of striking electrical or water lines.

e.      Management must be notified in writing by the Resident for the purpose of an inspection of the dish and its installation/mounting. If the dish is deemed to be unsafe by Management, then Resident agrees to take immediate remedial action.

f.      You are required to have liability insurance in force, with reasonable limits, covering injury to and death of persons and damage to or loss of property caused by your dish. Your insurance policy will be primary and you must provide a certificate of insurance to Management upon installation of the dish and thereafter on each anniversary date of such installation.

g.      At the end of your tenancy, you must have the dish removed and the installation site restored to its prior condition.

20.     PARKING SPACES. Due to the distribution of the parking spaces, we request that Residents park only one car near their apartment and park any additional cars in extra spaces adjacent to or across from the building. Under no circumstances will parking on the grass or in restricted areas be permitted. Carports and garages, if available, are leased to residents on a paid reservation basis. Unauthorized, abandoned, improperly licensed, and out-of-repair vehicles will be towed at the car owner's expense, subject to applicable laws. Non-commercial RV's, trailers, and boats are not permitted in this Community, except with the prior written consent of Management in Management's sole and absolute discretion, and if so consented to they must be parked in a designated area (if available) as assigned by Management.

21.     OPERATION OF MOTOR VEHICLES: CAR WASHING AND REPAIRING. IF RESIDENT OPERATES ANY MOTOR VEHICLES IN THE COMMUNITY, RESIDENT SHALL OBEY ALL SPEED LIMITS AND TRAFFIC LAWS AND SHALL EXERCISE EXTREME CAUTION. Due to the damage caused to asphalt and landscaping by detergents and cleaning solvents, washing of cars in the community will not be permitted unless designated by Management in a specific area. Residents also may not perform any repairs such as changing oil or tuning engines on their cars in the Community.

22.     SOLICITORS AND SALESPERSONS. Solicitation, canvassing and door-to-door sales promotion are prohibited. Because we want our Community Residents to enjoy the privacy of their apartments, we ask that any uninvited solicitors or salespersons be reported to the Office immediately.

23.     WINDOW COVERINGS. In order to enhance the appearance of your Community, all window coverings must appear white to the outside of the buildings. Sheets, blankets, etc. are not to be hung in place of draperies. Management has the right to determine the acceptability of the window coverings. Appropriate window coverings must be installed within ten (10) days of move-in.

24.     PATIOS AND BALCONIES. Please help us maintain an attractive Community. Only attractive, well-maintained furniture, suitable for outdoor use, is permitted. Residents must keep their patio or balcony neat and free of unsightly clutter. Final determination of any 'questionable' displays will be solely at the discretion of Management.

25.     FURNISHINGS. All apartment equipment, appliances and amenities are to be used for the purpose intended and in accordance with any instructions provided. Alterations to these furnishings is strictly prohibited without written consent of Management.

26.     PIPE FREEZE PREVENTION. If you plan to be away from your apartment for any length of time during the cold season, remember to leave the heat thermostat in your apartment set at 55 degrees. Failure to do so may result in damages such as water line freeze-ups, for which you would be held responsible.

Last updated: 01/12/12
Community Policies and Procedures

27.   **BARBECUE GRILLS.** Barbecue grills such as hibachi type, electrical charcoal starters or LP gas grills are not permitted on patios and balconies, and shall not be used within 25 feet of any building. When using barbecue grill, the following policies must be followed:  Barbecue grill use must comply with all local government codes and regulations; DO NOT leave grill unattended during use.  When finished cooking, extinguish combustible materials before leaving the equipment.  When removing or disposing of used charcoal briquettes, place ashes in a nonflammable container.  DO NOT PUT HOT BRIQUETTES IN DUMPSTERS.

28.   **NO LOITERING.** Residents must not permit or allow any servant, employee, or his/her children, or any of his/her guests or invitees to loiter or play in the elevators, lobby, corridors, landings, or stairs, lawns, parking areas, entrances, garage, basement or roof areas.

29.   **TERMINATION OF OCCUPANCY.** At termination of occupancy, Tenant must remove all of Tenant's property and leave apartment in broom-clean condition.  Any debris, furniture, clothing, etc. left in apartment or storage room after Tenant vacates and turns in keys to the rental office, is left at Tenant's risk and expense and may be disposed of in accordance with applicable law.

30.   **RULES OF CONDUCT.** The following conduct is strictly prohibited:

    a)    **Abuse.** Abuse, threats, and intimidation of others, whether to management, staff or other tenants, and whether through the use of electronic, written, verbal or physical means.

    b)    **Interfering with Apartment Project Operations.** Interfering with or disrupting any of the operations of the Apartment Project, including but not limited to, management, staff, administration, maintenance, fire, police or emergency services.

Any violation of these Rules of Conduct at the Apartment Project by a Tenant, any member of the Tenant's family, or any of the Tenant's guests, is a violation of the Lease by the Tenant (and the Tenant is responsible for the conduct of all of the aforesaid persons).

These Policies and Procedures have been incorporated into the Lease Agreement.  Failure to abide by these policies will result in legal action.  Thank you for your cooperation in helping us to maintain a positive living environment for each and every resident.

Tenants:

_____
Juan Carlos Escobar Barillas, Tenant

_____
Virginia de Jesús Peña Pezuelos, Tenant

_____
Jorge Armando Escobar Barillas, Tenant

_____
SLG (Sarah Garcia Gonzalez), Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C. its Agent

By: JBG/Company Manager XI L.L.C. Its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

THE JBG COMPANIES



## LEASE TERMINATION ADDENDUM

This Addendum to the Lease dated 08/08/2012 between Juan Carlos Escobar Badllas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Badillas, and Sara Judith Garcia Galdamez known as Tenant, and Fairmont Residential, L.L.C. ("Landlord") incorporated in and made a part of the aforesaid Lease.

It is agreed between the parties hereto that:

1.  In consideration of Landlord agreeing to release Tenant from the aforesaid Lease prior to its expiration date (as the same may have been renewed or extended), Tenant agrees to the following:

    a.   Tenant agrees to pay any and all outstanding rent which may be due and owing, at the time of the Intent to Vacate Notice; and

    b.   Tenant agrees to give to Landlord sixty (60) days notice of his intent to vacate, by written Intent to Vacate Notice.

    c.   Tenant agrees to pay to Landlord an additional Lease Termination Fee equal to 60 days.

    d.   Tenant agrees to reimburse Landlord for the total value of the rental concession used.

    e.   Provided that Tenant has complied with all of the foregoing, the Lease term shall terminate on

2.  All monies will be due and payable prior to Tenant moving out.

3.  The Security Deposit and disposition of same shall be handled separate and apart from the Lease Termination Fee and shall not be construed to be a part of the Lease Termination Fee.

4.  In the event Tenant shall abandon or vacate the Premises before the end of the term or fail to pay rent promptly when due, the Premises or any part thereof may be repossessed by Landlord and relet upon terms satisfactory to it, and Tenant shall be liable for deficiency resulting therefrom. Tenant's liability for deficiency includes but is not limited to painting, cleaning and repair costs. Landlord may apply Tenant's security deposit to rectify any damage caused by Tenant's vacating or abandonment. Application of the security deposit shall not waive or limit Landlord's right to further hold Tenant liable for costs and damages, losses or injury therein due.

5.  This Addendum shall supersede the Abandonment Clause now contained within the aforesaid Lease.

Tenant:

_____
Juan Carlos Escobar Badillas, Tenant

_____
Virginia de Jesus Peña Pozuelos, Tenant

_____
Jorge Armando Escobar Badillas, Tenant

_____
Sara Judith Garcia Galdamez, Tenant

Landlord:
**Fairmont Residential, L.L.C.**

By: JBG/Residential Management, L.L.C., its Agent

By: JBG/Company Member, L.L.C., its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

THE JBG COMPANIES



## MOLD AND MILDEW ADDENDUM

This Mold and Mildew Addendum (the "Addendum") dated 08/08/2013, is attached to and made a part of the lease dated 08/08/2013, (the "Lease") by and between Fairmont Residential, L.L.C. ("Landlord"), and Juan Carlos Escobar Barilles, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barilles, and Sara Judith Garcia Geldemez ("Tenant") for apartment number 904 (the "Apartment") in Fairmont Garden Apartments (the "Apartment Project").

Landlord agrees to maintain the Apartment in such a condition as to prevent the accumulation of moisture and the growth of mold, and to promptly respond to any written notices from Tenant as required herein. The forgoing notwithstanding, Tenant acknowledges that it is necessary for Tenant to, and Tenant agrees to, use reasonable efforts to maintain the Apartment in such a condition as to prevent accumulation of moisture and the growth of mold, and to promptly notify the Landlord, as required below, of any moisture accumulation that occurs or of any visible evidence of mold discovered by Tenant. Tenant further agrees to provide appropriate moisture control, keep the Apartment clean and dust the Apartment on a regular basis, and take other measures to retard and prevent mold and mildew form accumulating in the Apartment. Tenant agrees to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible. Tenant also agrees not to block or cover any of the heating, ventilation or air-conditioning ducts in the Apartment. Tenant also agrees to immediately report to the Management office: (i) any evidence of a water leak or moisture accumulation in the Apartment, as well as in any storage room, garage or other common area; (ii) any visible evidence of mold-or-mildew-like growth discovered by Tenant that cannot be removed by simply applying a common household cleaner and wiping the area; (iii) any failure or malfunction in the heating, ventilation or air-conditioning system in the Apartment and (iv) any inoperable doors or windows. Tenant further agrees that Tenant shall be responsible for damage to the Apartment and Tenant's property as well as personal injury to Tenant, other occupants of the Apartment, and other tenants and occupants of the Apartment Project resulting from Tenant's failure to comply with the terms of this Addendum.

Any failure of Tenant to comply with any provision of this Addendum shall be deemed a material default under the terms of the Lease, and Landlord shall be entitled to exercise all rights and remedies at law or in equity. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control. Any term that is capitalized but not defined in this Addendum that is capitalized and defined in the Lease shall have the same meaning for purposes of this Addendum as it has for purposes of the Lease.

Tenants:

_____
Juan Carlos Escobar Barilles, Tenant

_____
Virginia de Jesus Peña Pozuelos, Tenant

Jorge A E
_____
Jorge Armando Escobar Barilles, Tenant

_____
Sara Judith Garcia Geldemez, Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management, L.L.C., its Agent

By: JBG/Company Member III L.L.C., its Managing Member

By: _____

Name: _____

Title:  Authorized Signatory



THE JBG COMPANIES



## WAIVER OF LIABILITY

In consideration of the right to use the recreational and health facilities in the **Fairmont Garden Apartments**, at **4213 Wadsworth Court, Annandale, Virginia 22003** the undersigned acknowledges and agrees that neither **Fairmont Residential, L.L.C.** (owner) or JBG/Residential Management, L.L.C. or their affiliates, agents, employees, successors, or assigns shall be liable for any claims, demands, costs or expenses arising out of any personal injury, property damage or loss which may be sustained by the undersigned or any persons whom the undersigned allows to use the facilities, or their personal representatives or dependents, whether or not caused in whole or in part by the active or passive actions of **Fairmont Residential, L.L.C.** (owner) or JBG/Residential Management, L.L.C. or their affiliates, agents, employees, successors, or assigns or any cause whatsoever. In this regard, the undersigned hereby agrees to assume all risk of such occurrences and to hold **Fairmont Residential, L.L.C.** (owner) and JBG/Residential Management, L.L.C. and their affiliates, agents, employees, successors, or assigns harmless and indemnify and defend same against any and all claims, liabilities, damages, liens, and expenses (including, without limitation, reasonable attorneys' fees) arising directly or indirectly from any such occurrences. I have received approval from my physician to participate in this program.

Tenants:

_____
Juan Carlos Escobar Barillas, Tenant

_____
Virginia de Jesús Peña Pozuelos, Tenant

_____
Jorge Armando Escobar Barillas, Tenant

_____


Landlord:
**Fairmont Residential, L.L.C.**

By: JBG/Residential Management, L.L.C., its Agent

By: JBG/Residential Services III, L.L.C., its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES·                                                         

## Disclosure of Information on Lead Based Paint and/or Lead Based Paint Hazards

**Lead Warning Statement**

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, landlords must disclose the presence of known lead-based paint and lead-based paint hazards in the dwelling. Tenants must also receive a federally approved pamphlet on lead poison prevention.

**Lessor's Disclosure:**

a) Presence of lead-based paint or lead-based paint hazards:
   Known lead-based paint and/or lead-based paint hazards are present in housing:

Acur     b) Records and reports available to lessor:
(Initial)    Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement**

JAEB    c) Lessee has received copies of all information listed above.

VJPP    d) Lessee has received the pamphlet "Protect Your Family from Lead in Your Home."
(Initial)

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge that the information provided by the signatory is true and accurate.

Tenants:                                          Landlord:
                                                 Fairmont Residential, L.L.C.

_____                By: JBG/Residential Management L.L.C., its Agent
Juan Carlos Escobar Bonillas, Tenant
                                                 By: JBG/Company Managing III, L.L.C., its Managing Member
_____
Virginia de Jesus Peña Pezuelos, Tenant          By: _____
                                                 Name: _____
_____                Title:   Authorized Signatory
Jorge Aleximes Escobar Bonillas, Tenant

_____
Sara Yvette Garcia Galdamez, Tenant

THE JBG COMPANIES



## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN __Fairmont Residential, L.L.C.__ ("Licensor") and __Juan Carlos Escobar Barillas__ ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: __Y__

At the Advance Monthly License Fee of DOLLARS __($20.00)__, subject to increase by Licensor

Due on the First Day of Each Month Commencing __08/11/2013__

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number __004__ Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.  LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

    LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.  LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.  LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.  In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.  If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.  This License Agreement shall terminate upon the happening of any of the following events:

    (a) Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly licensee fee for each monthly licensee fee remaining unpaid within five days after it is due.

    (b) Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.

    (c) Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.  At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.  Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.

    (a) Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.

    (b) All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.

    (c) If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.

    (d) In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.

    (e) The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.

    (f) AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY

Last updated: 01/12/2012

LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.

(g)  Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the manner provided by applicable law.  A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law.  Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

8.   It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

_____
Juan Carlos Escobar Barillas, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C, its Agent

By: JBG/Company Manager III L.L.C, its Managing Member

By: _____

Name: _____

Title:  Authorized Signatory

Last updated: 01/12/2012



THE JBG COMPANIES



### JBG/RESIDENTIAL MANAGEMENT, L.L.C.
### PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C. ("Licensor") and Virginia de Jesus Peña Peruelos, ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: Y

At the Advance Monthly License Fee of DOLLARS ($25.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 06/21/2013

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 504 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.   LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or space shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.   LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property

3.   LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.   In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.   If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.   This License Agreement shall terminate upon the happening of any of the following events:

   (a)   Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly license fee for each monthly license fee remaining unpaid within five days after it is due.

   (b)   Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.

   (c)   Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.   At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.   Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.

   (a)   Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.

   (b)   All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.

   (c)   If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.

   (d)   In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.

   (e)   The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.

   (f)   AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.

   (g)   Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law. A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law. Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.  It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

Virginia de Jesus Peña Pezuelos, Tenant

Jorge Armando Escobar Bardfiles, Tenant

_____, Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C. its Agent

By: JBG/Commercial Management L.C., its Managing Member

By: _____

Name: _____

Title: Authorized Signatory

Last updated: 01/12/2012



THE JBG COMPANIES

## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C. ("Licensor") and Jorge Armando Escobar Barillas ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: Y

At the Advance Monthly License Fee of DOLLARS (329.50), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/11/2013

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 904 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the License fee likewise specified above, in accordance with the following terms and conditions:

1.  LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

    LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.  LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.  LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.  In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.  If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.  This License Agreement shall terminate upon the happening of any of the following events:
    (a)  Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly license fee for each monthly license fee remaining unpaid within five days after it is due.
    (b)  Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.
    (c)  Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.  At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.  Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.
    (a)  Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.
    (b)  All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.
    (c)  If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.
    (d)  In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.
    (e)  The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.
    (f)  AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.
    (g)  Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law. A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law. Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.   It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

Virginia de Jesús Peña Pozueles, Tenant

Jorge A. F.
Jorge A. _____ Bonillas, Tenant

Sara Justily Garcia Gutierrez, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JBG/Residential Management 1, L.L.C., as Agent

By: JBG/Companies Holdings 31, L.L.C., its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES



## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN <u>Fairmont Residential, L.L.C.</u> ("Licensor") and <u>Sara Judith Garcia Galdamez</u> ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: Y

At the Advance Monthly License Fee of DOLLARS ($25.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/15/2012

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 094 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.  LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

    LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.  LICENSEE agrees that all personal property left in any automobile while it is in any parking space on the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.  LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.  In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.  If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.  This License Agreement shall terminate upon the happening of any of the following events:

    (a)  Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR's option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly license fee for each monthly license fee remaining unpaid within five days after it's due.

    (b)  Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.

    (c)  Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.  At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.  Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.

    (a)  Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.

    (b)  All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.

    (c)  If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.

    (d)  In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.

    (e)  The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.

    (f)  AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.

    (g)  Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law. A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law. Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.  It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant

_____
Virginia de Jesus Peña Pezuelos, Tenant

_____
Jorge Armando Escobar Barillas, Tenant

_____
Sara Judith Garcia Galdamez, Tenant

Landlord:
**Fairmont Residential, L.L.C.**

By: JBG/Residential Management L.L.C., Partner

By: JBG/companies, a D.C. L.L.C. as Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

Last updated: 01/12/2012

The JBG Companies



## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C. ("Licensor") and Juan Carlos Escobar Barillas, ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: X

At the Advance Monthly License Fee of DOLLARS ($20.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/11/2013

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 004 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.  LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

    LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.  LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.  LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.  In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE herein will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.  If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.  This License Agreement shall terminate upon the happening of any of the following events:

    (a)  Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly license fee for each monthly license fee remaining unpaid within five days after it is due.

    (b)  Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.

    (c)  Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.  At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.  Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.

    (a)  Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.

    (b)  All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.

    (c)  If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.

    (d)  In parking spaces where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.

    (e)  The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.

    (f)  AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY

Last updated: 01/12/2012

LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.

(g)   Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant. In such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the manner provided by applicable law. A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law. Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.   It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

_____
Judy Carla DeCoster-Barillas, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C., its Agent

By: JBG/Commercial Management, L.L.C., its Managing Member

By: _____
Name: _____
Title:   Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES

## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C. ("Licensor") and Virginia de Jesus Peña Porrudas ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: Y

At the Advance Monthly License Fee of DOLLARS ($20.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/11/2011

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 064 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.  LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

    LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.  LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.  LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.  In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.  If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.  This License Agreement shall terminate upon the happening of any of the following events:
    (a)  Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR's option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly licensee fee for each monthly license fee remaining unpaid within five days after it is due.
    (b)  Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.
    (c)  Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.  At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.  Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.
    (a)  Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.
    (b)  All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.
    (c)  If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicle owner's sole risk and expense.
    (d)  In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.
    (e)  The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.
    (f)  AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.
    (g)  Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law. A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law. Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitees, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.   It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

_____
Virginia de Jesus Peña Pozuelos, Tenant

_____
Jorge Antonio Escobar Barrios, Tenant

_____
Saul Julian Garcia Gutierrez, Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C. its Agent

By: JBG/Companies of Maryland LLC, its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

Last updated: 01/12/2012



THE JBG COMPANIES

## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C. ("Licensor") and Jorge Armando Escobar Barillas ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: Y

At the Advance Monthly License Fee of DOLLARS ($20.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/11/2013

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 604 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1. LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

   LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2. LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3. LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4. In Garages which require the use of a Key Card, Transmitter, or Key, LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5. If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6. This License Agreement shall terminate upon the happening of any of the following events:

   (a) Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly licensee fee for each monthly license fee remaining unpaid within five days after it is due.

   (b) Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.

   (c) Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7. At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8. Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made known to LICENSEE.

   (a) Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.

   (b) All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.

   (c) If parking spaces are assigned, automobiles must be parked in their assigned spaces only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicle owner's sole risk and expense.

   (d) In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.

   (e) The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.

   (f) AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.

   (g) Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law.  A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law.  Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.     It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

_____
Virginia de Jesus Peña Pozuelos, Tenant

_____
Jorge Arturo Escobar Barillas, Tenant

_____
Jose Justin Garcia Galdamez, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JRC/Residential Management, L.L.C, its Agent

By: JRC/Commercial Management LCA, its Managing Member

By: _____

Name: _____

Title:   Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES

## JBG/RESIDENTIAL MANAGEMENT, L.L.C.
## PARKING LICENSE AGREEMENT

BETWEEN Fairmont Residential, L.L.C., ("Licensor") and Sara Judith Garcia Galdamez, ("Licensee").

Reserved Parking Space Number (if applicable)

Location of Garage

Check here if unassigned, non-reserved parking: X

At the Advance Monthly License Fee of DOLLARS ($25.00), subject to increase by Licensor

Due on the First Day of Each Month Commencing 08/13/2013

Key Card/Transmitter/Key Deposit DOLLARS ($)

Apartment Number 904 Parking Permit #

Automobile Tag Number

In consideration of the mutual agreements between the parties LICENSOR does hereby grant a month-to-month License to LICENSEE to use the parking permit to park in the Garage specified above at the license fee likewise specified above, in accordance with the following terms and conditions:

1.     LICENSEE understands and agrees that said parking permit is to be used for the parking of a passenger automobile only, and that the parking, moving and removal of Licensee's automobile in or from the Garage, any parking space or parking area shall be at Licensee's sole risk and expense. Licensee agrees that the parking permit shall be used only by the Licensee. Licensee expressly agrees not to use or cause to be used any employee of Licensor for the purpose of parking, moving or removing any automobile in or from the Garage or any parking space. If any employee of the Licensor shall, at the request of Licensee or any member of Licensee's household, handle, move, park or drive any automobile in or from the Garage or any parking space, such employee shall be deemed to be the agent of Licensee and the Licensor shall not be liable for any loss or damage caused by said employee used for such purpose.

        LICENSOR reserves the right to increase the Monthly License Fee at any time upon written notice to LICENSEE. In the event of any increase in any applicable parking taxes by the District of Columbia, the Monthly License Fee will automatically increase by the amount of the increase in such taxes.

2.     LICENSEE agrees that all personal property left in any automobile while it is in any parking space or the Garage of which it is a part shall be at the sole risk of Licensee or the persons owning the same, and that Licensor shall in no event be liable for the loss, destruction, theft of, or damage to, such property.

3.     LICENSEE agrees to keep his/her automobile locked at all times while it is parked in said Garage. LICENSEE agrees that LICENSOR shall not be required to have any agent or attendant in the Garage at any time, and LICENSOR shall not be liable for loss or damage to said automobile or its contents, from any cause or causes, or particularly due to fire, theft, collision, or vandalism.

4.     In Garages which require the use of a Key Card, Transmitter, or Key. LICENSEE agrees that he/she will deposit with the LICENSOR the amount specified above for each Key Card, Transmitter or Key issued to LICENSEE. The deposit is refundable when the LICENSEE vacates the Garage and returns the Key Card, Transmitter or Key to the LICENSOR. If the Key Card, Transmitter, or Key is lost, stolen or mutilated, an additional charge in the amount of the original deposit will be made for the issuance of the new Key Card, Transmitter, or Key. Said replacement charge is not refundable.

5.     If the use of an assigned, numbered parking space has been granted under this license agreement, LICENSOR reserves the right at any time to change the parking space assigned to LICENSEE, or to eliminate assigned numbered parking spaces altogether. If assigned numbered parking spaces are eliminated, parking will thereafter be on a first come, first served basis.

6.     This License Agreement shall terminate upon the happening of any of the following events:
        (a)   Upon failure of LICENSEE to pay the monthly license fee within five days after it is due. At LICENSOR'S option, LICENSEE may continue use of the parking permit and Garage, but LICENSOR will levy a late charge of five percent (5%) of the monthly license fee for each monthly license fee remaining unpaid within five days after it is due.
        (b)   Upon vacation of LICENSEE from the apartment number specified in this Parking License Agreement.
        (c)   Upon the expiration of thirty (30) days after notice from the first of the month by LICENSOR to LICENSEE or by LICENSEE to LICENSOR that this License Agreement is being terminated.

7.     At the termination of this License Agreement upon any of the events specified in Paragraph 6 above, LICENSEE will be required to remove his/her automobile from the Garage at the time of termination, without further notice from LICENSOR. If LICENSEE fails to remove his/her automobile immediately upon termination, then LICENSOR shall have the right, and is hereby authorized, to have the automobile towed away and stored, in accordance with the laws of the applicable jurisdiction, at LICENSEE's sole risk and expense.

8.     Parking Rules and Regulations. LICENSEE agrees to abide by the Parking Rules and Regulations hereinafter set forth, or any changes or additions to said Rules and Regulations which may be hereafter made by LICENSOR and made known to LICENSEE.
        (a)   Parking in the Garage is restricted to passenger automobiles only. No parking of boats, trailers, trucks, buses or commercial vehicles shall be permitted. Motorcycles must be parked in areas designated for motorcycles.
        (b)   All automobiles parked in the Garage must have current license tags and be in operating condition. Automobiles left in the Garage with expired tags or without tags, automobiles in a state of disrepair, or abandoned automobiles shall be towed away at the vehicle owner's sole risk and expense.
        (c)   If parking spaces are assigned, automobiles must be parked in their assigned space only. All unassigned spaces are available on a first come, no reservation basis. Automobiles parked outside the space designated for the parking of such automobile or parked in violation of the parking regulations established by the LICENSOR, or in violation of any law or ordinance, shall be towed away at the vehicles owner's sole risk and expense.
        (d)   In parking areas where a parking sticker is required, a valid current sticker must be displayed at all times. Any automobile not displaying a current, valid sticker shall be subject to towing at the vehicle owner's sole risk and expense.
        (e)   The repair, washing and/or testing of any automobile or its engine in any parking area is strictly prohibited.
        (f)   AT ALL TIMES WHILE OPERATING ANY VEHICLE ON THE GROUNDS OF THE APARTMENT PROJECT OR ANY PART THEREOF, TENANT, HIS/HER FAMILY, AGENTS, EMPLOYEES, SOCIAL GUESTS OR INVITEES SHALL OBSERVE ALL SPEED LIMITS AND PARKING REGULATIONS AS POSTED OR INDICATED BY LANDLORD AND/OR LOCAL AUTHORITIES AND SHALL EXERCISE EXTREME CAUTION.
        (g)   Tenant hereby irrevocably constitutes and appoints Landlord and Agent as his/her attorney in fact to remove any vehicle parked in violation of this Lease and to store the vehicle, at the cost and expense of Tenant, in such place or places as Landlord or Agent, in its sole discretion, may deem proper, or to dispose of the vehicle in the

Last updated: 01/12/2012

manner provided by applicable law.  A lien for the costs and expenses of towing and storing a vehicle may be enforced by Landlord or Agent in the manner and to the extent provided under applicable law.  Tenant agrees to indemnify and hold Landlord and Agent harmless from claims and all costs and expenses incurred, including but not limited to reasonable attorney's fees, resulting from the towing of motor vehicles belonging to Tenant, members of Tenant's family, or his/her agents, employees, guests, or invitee, where such motor vehicles are parked in violation of this Lease or any parking rules or regulations.

9.      It is expressly understood that this is a License Agreement only and conveys no interest of any kind, possessory or otherwise in or to any parking space, other than a mere right to use the Garage for the parking of an automobile, under the terms and conditions of this License Agreement. This License is granted to Licensee only and cannot be transferred or assigned.

Tenant:

_____
Virginia de Jesús Peña Pozuelos, Tenant

_____
Jorge Armando Escobar Borillas, Tenant

_____
Sara Judith García Goldámez, Tenant

Landlord:

**Fairmont Residential, L.L.C.**

By: JRG/Residential Management, L.L.C. as Agent

By: JRG/Gardens at Fairmont III, L.L.C. its Managing Member

By: _____

Name: _____

Title:    Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES



VIRGINIA RESIDENTIAL LEASE ADDENDUM

RATIO UTILITY BILLING SYSTEM

The undersigned agree that this Addendum is incorporated in and made a part of the lease between Fairmont Residential, L.L.C. ("Landlord", and Juan Carlos Escobar Barillas, Virginia De Jesus Peña Ponuelos, Jhona Armando Escobar Barillas, And Sara Judith Garcia Galdamez (jointly and severally, "Tenant"), dated August 8, 2013 and that it shall be renewed and shall expire under the terms and conditions of the Lease.

1. **General Ratio Utility Billing System Information:**

   a. The Premises is located in a residential apartment building (which is referred to herein as the "Property") situated in Annandale, Virginia, and therefore state and country/city laws require that these agreements of Landlord and Tenant shall be set forth in this Addendum. In the event of any conflict between the provisions of this Addendum and any provision of the Lease, the provisions of this Addendum shall control.

   b. Tenant shall pay all utilities and service charges related to occupancy of the Premises set forth herein including, without limitation, electricity, natural gas, water, sewer and trash collection. The amount of the utilities bill is subject to applicable government rules, regulations, and guidelines and the rules or actions of the utility company furnishing the service.

   c. The billing provider that w'll service Tenant's accounts is: Conservice Utility Management and Billing, or such billing provider as Landlord may choose from time to time in its sole and absolute discretion (the "Billing Provider"). Tenant acknowledges that the Billing Provider is not a public utility. The Landlord reserves the right to change any billing method or formula described herein as permitted by law, upon thirty (30) days prior written notice to Tenant.

2. **Water and Sewer Charges:**

   The Tenant shall be billed directly by Landlord for Tenant's share of water and sewer utilities, and the Tenant's bill shall be calculated pursuant to the following allocation formula, not an actual meter reading:

   Water/Sewer master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

3. **Gas Charges:**

   a. ✓ [Check as Applicable] The Tenant shall be billed directly by Landlord for its share of gas utility, and the Tenant's bill shall be calculated pursuant to following allocation formula, not an actual meter reading:

   Master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

   OR

   b. _____ [Check as Applicable] Before Tenant occupies Tenant's unit, Tenant shall promptly contact the local gas utility company to establish an account in Tenant's name for the provision of gas service to Tenant's unit. Tenant shall ensure that the start date for each such account is the Tenant's move-in date. If Tenant fails to comply with the conditions of this paragraph and Landlord is subsequently charged with utility charges attributable to Tenant's unit, then Tenant shall be issued (and shall pay) a bill for such utility charges (and all late fees and other fees) by Landlord or the Billing Provider (which shall include a service charge by Landlord or the Billing Provider in the amount up to $50 on each occasion); such service charge is used to reimburse Landlord for administrative and billing costs and charges assessed by the third party Billing Provider to Landlord for processing of the bill for the delinquent time period. Tenant and Landlord agree that the charge described above is a reasonable estimate of the costs incurred

4. **Electric Charges:**

   a. ✓ [Check as Applicable] The Tenant shall be billed directly by Landlord for its share of electric utility, and the Tenant's bill shall be calculated pursuant to the following allocation formula, not an actual meter reading:

   Master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

   OR

   b. _____ [Check as Applicable] Before Tenant occupies Tenant's unit, Tenant shall promptly contact the local electric utility company to establish an account in Tenant's name for the provision of electric service to Tenant's unit. Tenant shall ensure that the start date for each such account is the Tenant's move-in date. If Tenant fails to comply with the conditions of this paragraph and Landlord is subsequently charged with utility charges attributable to Tenant's unit, then Tenant shall be issued (and shall pay) a bill for such utility charges (and all late fees and other fees) by Landlord or the Billing Provider (which shall include a service charge by Landlord or the Billing Provider in the amount of $50 on each occasion); such service charge is used to reimburse Landlord for administrative and billing costs and charges assessed by the third party Billing Provider to Landlord for processing of the bill for the delinquent time period. Tenant and Landlord agree that the charge described above is a reasonable estimate of the costs incurred

5. **Trash Service Fee:**

   The Tenant shall be billed directly by Landlord for its share of the costs of trash collection for the entire property. The Tenant's bill shall be its pro rata share of the Landlord's master bill for trash charges at the Property, including taxes thereon and increases therein. The Tenant's pro rata share shall be based on the total occupied apartments. For occupied apartments, Landlord's master bill will be allocated based on square footage and number of occupants of the occupied apartment. As part of each month's trash bill, Tenant shall pay an administrative fee which is used to cover administrative and billing expenses.

6. **Administrative Fee:**

   As permitted under applicable law, Tenant shall pay to Landlord an administrative fee for all utilities in an amount equal to $3.95 per month, which is used to cover administrative and billing expenses. Landlord reserves the right to increase this fee in the event of an increase in Landlord's actual expenses if permitted by law. Increases in postage rates shall increase the administrative fee without the necessity of notice to Tenant. Other increases in administrative and billing expenses will increase the administrative fee upon thirty (30) days prior written notice to Tenant. However, in no event will the administrative fee be increased more than 50% during any calendar year.

7. **Utility Bill, Late Fee and Due Date:**

   a. Tenant shall receive the utility bill from the Billing Provider. The method of payment, due date and other information will be stated on the bill.

   b. Landlord and Tenant agree that the actual cost to Landlord and/or Billing Provider when Tenant fails to pay any utility bill on time is difficult or impossible to ascertain, but the parties agree that Landlord and/or Billing Provider does, in the event of a late payment, incur certain costs, such as (but not limited to) additional bookkeeping and administrative charges, additional charges from the Billing Provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc.

   c. Tenant agrees that Landlord may turn over Tenant's account to a collection agency in the event that Tenant fails to pay any utility bills on time.

8. **Remedies:**

   The failure of Tenant to make payment in full for any utilities bill for more than ten (10) days after the due date shall be a default under the Lease. Landlord shall be entitled to pursue any and all legal remedies available under the Lease and applicable law, including, but not limited to eviction. Nothing in this section shall affect a Tenant's rights under applicable laws. If permitted by applicable law, upon termination or expiration of the Lease, unpaid utility bills may be deducted from Tenant's security deposit.

[SIGNATURES CONTAINED ON FOLLOWING PAGE]

THE JBG COMPANIES



**VIRGINIA RESIDENTIAL LEASE ADDENDUM**

**RATIO UTILITY BILLING SYSTEM**

**9.   Returned Checks:**

Landlord and Tenant agree that the actual cost to Landlord or Billing Provider when Tenant pays any utility bill by a check which is subsequently dishonored by the financial institution, is difficult or impossible to ascertain, but the parties do agree that Landlord or Billing Provider do, in the event of a dishonored check, incur certain costs, such as (but not limited to) additional bookkeeping and administrative charges, bank charges, lost opportunity costs of the missed payment. The parties accordingly agree that Tenant will pay a $50.00 processing fee for each check submitted by Tenant that is returned by the financial institution for any reason, including insufficient funds and closed account. If a check submitted by Tenant is in fact returned, Landlord reserves the right to require that all future payments by Tenant be tendered by Certified Check.

**10.   Account Set-Up:**

Tenant agrees to pay a one-time utility account set-up fee in the amount of $10.00. This fee shall be included on Tenant's first utility bill.

**11.   Move-out Fee:**

Tenant agrees to pay a one-time utility account processing fee in the amount of $1.95 when Tenant vacates the Unit. This fee shall be included on Tenant's final utility bill.

**12.   Limitation of Liability:**

Landlord shall not be liable for any losses or damages that result from outages, interruptions, or fluctuations in utilities provided to the Premises, except to the extent applicable law prohibits the foregoing release of Landlord. Tenant hereby releases Landlord from any and all such claims arising from or relating to such outages, interruptions or fluctuations. Tenant hereby waives any and all claims for offset, rent reduction or diminished value of the Premises due to such outages, interruptions or fluctuations.

**13.   No Waiver/Receiving Rent:**

Waiver by Landlord of any requirement contained in this Addendum will not constitute a continuing waiver of any subsequent requirement. Landlord's receipt of rent with knowledge of Tenant's failure to pay utility charges does not waive Landlord's right to enforce any covenant of this Addendum or the Lease. No waiver by either party of a provision of this Addendum will be considered to have been made unless expressed in writing and signed by all parties.

**14.   Miscellaneous:**

a.   Landlord and Tenant agree that the exact amount of water, sewer, gas and electricity utility services and trash consumed by Tenant and within the common areas cannot be determined precisely; however, the Tenant agrees that the methods used herein to calculate the allocation formulas are reasonably accurate estimates. Because the allocation formulas are not an exact reading from a submeter, the Tenant acknowledges that it may be paying for utility services in the common areas or in other dwelling units. Additionally, all utility service charges assessed to the Landlord may be used to calculate the amount charged to each resident, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all charges contained on the utility bills received by Landlord.

b.   Tenant represents that all occupants who will reside in the Premises are properly and accurately reflected in the Lease. Tenant hereby agrees to immediately notify Landlord of any change in the number of occupants in the Premises.

c.   If any provision of this Addendum is held invalid or unenforceable by any court, it is the intent of the parties that all other provisions of this Addendum be construed to remain fully valid, enforceable, and binding on the parties.

d.   Terms not defined in this Addendum shall have the meaning given to them in the Lease.

TENANTS:

Maria Perpetua Escobar Banillas

Virginia De Jesús Peña Pozuelos

Jorge Armando Escobar Banillas

Saira Judith Garcia Gonzalez

LANDLORD:

Fairmont Residential, L.L.C.

By:   JBG/Residential Management, L.L.C., its Agent

By:   JBG/Container Manager  III, L.L.C., its Managing
      Member

By:

Name:

Title: Authorized Signatory

THE JBG COMPANIES®



### Virginia Residential Lease Addendum

### Ratio Utility Billing System

The undersigned agree that this Addendum is incorporated in and made part of the Lease between **Fairmont Residential, L.L.C.** ("Landlord") and **Juan Carlos Escobar Bariilas, Virginia de Jesus Peña Pornelos, Jorge Amanda Escobar Barillas, and Sara Justin Garcia Galdamez** (jointly and severally, "Tenant"), dated **06/08/2013** and that it shall be renewed and shall expire under the terms and conditions of the Lease.

1. **General Ratio Utility Billing System Information:**

   a.   The Premises is located in a residential apartment building (which is referred to herein as the "Property") situated in **Fairfax County**, Virginia, and therefore state and countrywide laws require that these agreements of Landlord and Tenant shall be set forth in this Addendum. In the event of any conflict between the provisions of this Addendum and any provision of the Lease, the provisions of this Addendum shall control.

   b.   Tenant shall pay all utilities and service charges related to occupancy of the Premises set forth herein including, without limitation, electricity, natural gas, water, sewer and trash collection. The amount of the utilities bill is subject to applicable government rules, regulations, and guidelines and the rules or actions of the utility company furnishing the service.

   c.   The billing provider that will service Tenant's accounts is: Conservice Utility Management and Billing, or such billing provider as Landlord may choose from time to time in its sole and absolute discretion (the "Billing Provider"). Tenant acknowledges that the Billing Provider is not a public utility. The Landlord reserves the right to change any billing method or formula described herein as permitted by law, upon thirty (30) days prior written notice to Tenant.

2. **Water and Sewer Charges:**

   The Tenant shall be billed directly by Landlord for Tenant's share of water and sewer utilities, and the Tenant's bill shall be calculated pursuant to the following allocation formula, not an actual meter reading:

   Water/Sewer master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

3. **Gas Charges:**

   a. ✓  [Check as Applicable] The Tenant shall be billed directly by Landlord for its share of gas utility, and the Tenant's bill shall be calculated pursuant to the following allocation formula, not an actual meter reading: master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

   OR

   b. _____ [Check as Applicable] Before Tenant occupies Tenant's unit, Tenant shall promptly contact the local gas utility company to establish an account in Tenant's name for the provision of gas service to Tenant's unit. Tenant shall ensure that the start date for each such account is the Tenant's move-in date. If Tenant fails to comply with the conditions of this paragraph and Landlord is subsequently charged with utility charges attributable to Tenant's unit, then Tenant shall be issued (and shall pay) a bill for such utility charges (and all late fees and other fees) by Landlord or the Billing Provider (which shall include a service charge by Landlord or the Billing Provider in the amount up to $30 on each occasion); such service charge is used to reimburse Landlord for administrative and billing costs and charges assessed by the third party Billing Provider to Landlord for processing of the bill for the delinquent time period. Tenant and Landlord agree that this charge described above is a reasonable estimate of the costs incurred.

4. **Electric Charges:**

   a. ✓  [Check as Applicable] The Tenant shall be billed directly by Landlord for its share of electric utility, and the Tenant's bill shall be calculated pursuant to the following allocation formula, not an actual meter reading: master bill for property minus common area deduction divided by occupied apartments. For occupied apartments, bill will be allocated based on square footage and number of occupants.

   OR

   b. _____ [Check as Applicable] Before Tenant occupies Tenant's unit, Tenant shall promptly contact the local electric utility company to establish an account in Tenant's name for the provision of electric service to Tenant's unit. Tenant shall ensure that the start date for each such account is the Tenant's move-in date. If Tenant fails to comply with the conditions of this paragraph and Landlord is subsequently charged with utility charges attributable to Tenant's unit, then Tenant shall be issued (and shall pay) a bill for such utility charges (and all late fees and other fees) by Landlord or the Billing Provider (which shall include a service charge by Landlord or the Billing Provider in the amount up to $60 on each occasion); such service charge is used to reimburse Landlord for administrative and billing costs and charges assessed by the third party Billing Provider to Landlord for processing of the bill for the delinquent time period. Tenant and Landlord agree that the charge described above is a reasonable estimate of the costs incurred.

5. **Trash Service Fees:**

   The Tenant shall be billed directly by Landlord for its share of the costs of trash collection for the entire property. The Tenant's bill shall be its pro rata share of the Landlord's master bill for trash charges of the Property, including taxes thereon and increases therein. The Tenant's pro rata share shall be based on the total occupied apartments. For occupied apartments, Landlord's master bill will be allocated based on square footage and number of occupants of the occupied apartment. As part of each month's trash bill, Tenant shall pay an administrative fee which is used to cover administrative and billing expenses.

6. **Administrative Fee:**

   As permitted under applicable law, Tenant shall pay to Landlord an administrative fee for all utilities in an amount equal to $3.95 per month, which is used to cover administrative and billing expenses. Landlord reserves the right to increase this fee in the event of an increase in Landlord's actual expenses if permitted by law. Increases in postage rates shall increase the administrative fee without the necessity of notice to Tenant. Other increases in administrative and billing expenses will increase the administrative fee upon thirty (30) days prior written notice to Tenant. However, in no event will the administrative fee be increased more than 60% during any calendar year.

7. **Utility Bill, Late Fee and Due Date:**

   a.   Tenant will receive the utility bill from the Billing Provider. The method of payment, due date and other information will be stated on the bill.

   b.   Landlord and Tenant agree that the actual cost to Landlord and/or Billing Provider when Tenant fails to pay any utility bill on time is difficult or impossible to ascertain, but the parties agree that Landlord and/or Billing Provider does, in the event of a late payment, incur certain costs, such as (but not limited to) additional bookkeeping and administrative charges, additional charges from the Billing Provider, costs in printing and mailing late notices, lost opportunity costs of the payment.

   c.   Tenant agrees that Landlord may turn over Tenant's account to a collection agency in the event that Tenant fails to pay any utility bills on time.

[SIGNATURES ARE CONTAINED ON THE FOLLOWING PAGE]

346614v1, Revised Sep 2011                                   1

**8. Remedies:**

The failure of Tenant to make payment in full for any utilities bill for more than ten (10) days after the due date shall be a default under the Lease. Landlord shall be entitled to pursue any and all legal remedies available under the Lease and applicable law, including, but not limited to eviction. Nothing in this section shall affect a Tenant's rights under applicable laws. If permitted by applicable law, upon termination or expiration of the Lease, unpaid utility bills may be deducted from Tenant's security deposit.

**9. Returned Checks:**

Landlord and Tenant agree that the actual cost to Landlord or Billing Provider when Tenant pays any utility bill by a check which is subsequently dishonored by the financial institution, is difficult or impossible to ascertain, but the parties do agree that Landlord or Billing Provider do, in the event of a dishonored check, incur certain costs, such as (but not limited to) additional bookkeeping and administrative charges, bank charges, lost opportunity costs of the missed payment. The parties accordingly agree that Tenant will pay a $50.00 processing fee for each check submitted by Tenant that is returned by the financial institution for any reason, including insufficient funds and closed account. If a check submitted by Tenant is in fact returned, Landlord reserves the right to require that all future payments by Tenant be tendered by Certified Check.

**10. Account Set-up:**

Tenant agrees to pay a one-time utility account set-up fee in the amount of $10. This fee shall be included on Tenant's first utility bill.

**11. Move-Out Fee:**

Tenant agrees to pay a one-time utility account processing fee in the amount of $1.95 when Tenant vacates the Unit. This fee shall be included on Tenant's final utility bill.

**12. Limitation of Liability:**

Landlord shall not be liable for any losses or damages that result from outages, interruptions, or fluctuations in utilities provided to the Premises, except to the extent applicable law prohibits the foregoing release of Landlord. Tenant hereby releases Landlord from any and all such claims arising from or relating to such outages, interruptions or fluctuations. Tenant hereby waives any and all claims for offset, rent reduction or diminished value of the Premises due to such outages, interruptions or fluctuations.

**13. No Waiver/Receiving Rent:**

Waiver by Landlord of any requirement contained in this Addendum will not constitute a continuing waiver of any subsequent requirement. Landlord's receipt of rent with knowledge of Tenant's failure to pay utility charges does not waive Landlord's right to enforce any covenant of this Addendum or the Lease. No waiver by either party of a provision of this Addendum will be considered to have been made unless expressed in writing and signed by all parties.

**14. Miscellaneous:**

a. Landlord and Tenant agree that the exact amount of water, sewer, gas and electricity utility services and trash consumed by Tenant and within the common areas cannot be determined precisely; however, the Tenant agrees that the methods used herein to calculate the allocation formulas are reasonably accurate estimates. Because the allocation formulas are not an exact reading from a submeter, the Tenant acknowledges that it may be paying for utility services in the common areas or in other dwelling units. Additionally, all utility service charges assessed to the Landlord may be used to calculate the amount charged to each resident, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all charges contained on the utility bills received by Landlord.

b. Tenant represents that all occupants who will reside in the Premises are properly and accurately reflected in the Lease. Tenant hereby agrees to immediately notify Landlord of any change in the number of occupants in the Premises.

c. If any provision of this Addendum is held invalid or unenforceable by any court, it is the intent of the parties that all other provisions of this Addendum be construed to remain fully valid, enforceable, and binding on the parties.

d. Terms not defined in this Addendum shall have the meaning given to them in the Lease.

Tenants:

Landlord:

Fairmont Residential, L.L.C.

Noel Carlos Escobar Bardles, Tenant

By: JBG/Residential Management L.L.C. its agent

By: JBG/Company Member III, L.L.C. its Managing Member

Virginia de Jesus Peña Pozuelos, Tenant

By:

Name:

Title: Authorized Signatory

Jorge A.E.

Jorge Armando Bernaza Bardles, Tenant

Noel Julatin Garcia Garcia, Tenant

346914v1. Revised Sep 2011

2

THE JBG COMPANIES



## WATER AND SEWER CHARGE ADDENDUM

This Water and Sewer Charge Addendum (the "Addendum") dated 08/08/2013 is attached to and made a part of the lease dated 08/08/2013 (the "Lease") by and between Fairmont Residential, L.L.C. ("Landlord"), and Juan Carlos Escobar Barillas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barillas, and Sara Judith Garcia Galdamez ("Tenant") for apartment number 884 (the "Apartment") at 4213 Wadsworth Court, Annandale, Virginia 22003, Fairmont Garden Apartments (the "Apartment Project").

Tenant acknowledges that water and sewer charges will be billed to Tenant by Conservice, LLC, pursuant to a separate agreement with Landlord, and Tenant agrees to pay to Conservice, LLC promptly when due all such charges billed to Tenant for the Apartment.

Any failure to comply with any provision of this Addendum shall be deemed a material default under the terms of the Lease, and Landlord shall be entitled to exercise all rights and remedies at law or in equity. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control. Any term that is capitalized but not defined in this Addendum that is capitalized and defined in the Lease shall have the same meaning for purposes of this Addendum as it has for purposes of the Lease.

Tenant:

Juan Carlos Escobar Barillas, Tenant

Virginia de Jesus Peña Pozuelos, Tenant

Jorge Armando Escobar Barillas, Tenant

Sara Judith Garcia Galdamez, Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C., its Agent

By: JBG/Company Member IV, L.L.C., its Managing Member

By: _____

Name: _____

Title: Authorized Signatory

Last updated: 01/12/2012

THE JBG COMPANIES



**Addendum to Lease Agreement**
**Sound and Noise Addendum**

THIS ADDENDUM is attached to and is an integral part of the Lease Agreement dated 08/06/2011, ("Lease"), between Fairmont Residential, L.L.C., ("Landlord"), and Juan Carlos Escobar Barillas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barillas, and Sara Judith Garcia Galdamez (jointly and severally, "Tenant") for Apartment No. 084 (the "Premises") in the project known as Fairmont Garden Apartments ("Project").

Tenant hereby acknowledges and agrees that it is the nature of multifamily and mixed use properties (such as the Project of which the Premises is a part) that apartment units are built in close proximity to one another (resulting in sharing of common walls, floors and ceilings) and noise is frequently audible from one apartment unit to the next no matter how much sound proofing is attempted. Tenant further acknowledges and agrees that preventing or insulating against sound in the Premises coming from an adjacent apartment unit in a manner comparable to a detached single-family residence is impossible to attain, and that there will usually be some audio awareness of one's neighbors.

In addition to the foregoing, Tenant further acknowledges and agrees that the Project in which the Premises is located includes and is located adjacent to or near commercial retail businesses and restaurants, bars and/or entertainment venues, and that a residential and mixed use project located in an urban setting, including the Project in which the Premises is located, will be subject to street and neighborhood noises.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Addendum as of the day and year first above written.

Tenants:

_____, Tenant
Juan Carlos Escobar Barillas, Tenant

_____, Tenant
Virginia de Jesus Peña Pozuelos, Tenant

_____, Tenant
Jorge Armando Escobar Barillas, Tenant

_____, Tenant
Sara Judith Garcia Galdamez, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JBG/Residential Management L.L.C., as Agent

By: JBG/Commons Manager III L.L.C., its Managing Member

By: _____
Name: _____
Title: Authorized Signatory

Last updated: 01/12/2012

## RENT PAYMENT POLICY FOR THE JBG COMPANIES

Carefully read the following Rent Payment Policy. If you have any questions, please contact the **Fairmont Garden Apartments** leasing office at **7035787586**.

### PAYMENT OF RENT

Payment of rent and utilities, in full, is due on or before the **1st** day of each month without a grace period. Payment may either be made online (**fairmontgardensapartments.com**) or dropped off at the Leasing Office (**4137 Wadsworth Court**). Payments received after the **10th** day of the month must be in the form of a certified check. We do not accept cash or money orders. If you are instructed to pay by cash or by money order, please contact our Corporate Office at 240-333-3702 immediately. Payment received after the close of business will be credited the next business day. To obtain a receipt, payment must be made at the office during normal business hours.

### LATE CHARGES

The penalty for late payments is **18%** of the monthly rent and this charge will be assessed after the **3rd** day of each month. Payments will first be applied to any outstanding charges, then to the current month's late charges and related fees, and lastly to the current month's rent.

### LEGAL FEES

Failure to pay rent on or before the **1st** day of the month is considered a violation of your lease agreement. Outstanding accounts are forwarded to our legal department for legal action for non-payment of rent and a summons will be filed against all leaseholders at any time after the **3rd** day of each month. Applicable attorney's fees and court costs will be assessed to your account along with any late charges that have accrued up until the time payment is received.

### RETURNED CHECK FEE

Checks returned for any reason must be replaced by certified check. The returned check fee of **$60.00** plus a late fee of **18%** of the monthly rent are due within 24 hours of notification. In addition, personal checks will no longer be accepted for a minimum period of **16 months**.

### PROOF OF PAYMENT

It is the residents' responsibility to provide proof of payment to **Fairmont Garden Apartments** if necessary. As a result, it is recommended that residents maintain copies of all rent and fee payment images (canceled checks, receipts, etc.) during their tenancy here at **Fairmont Garden Apartments**.

Tenants:

_____
Juan Carlos Sanchez Bonillas, Tenant

_____
Virginia de Jesus Peña Posvelos, Tenant

_____
Jorge Armando Escobar Bonilla, Tenant

_____
Eser Omilia Garcia Calderon, Tenant

Landlord:

Fairmont Residential, L.L.C.

By: JBG/Residential Management, L.L.C., its Agent

By: JBG Company Manager III, L.L.C., its Managing Member

By: _____

Name: _____

Title: Authorized Signatory

Last updated: 01/12/2012



## THE JBG COMPANIES

### ADDENDUM FOR ELECTRONIC RENT PAYMENT

The undersigned Tenant hereby agrees to pay to Landlord all monthly rent payments and other charges under the attached Lease Agreement by electronic funds transfer over the internet (for example, by bank debit to checking or savings, Moneygram, charge to credit or debit card or other means of electronic funds transfer acceptable to Landlord). Contemporaneously with signing this Addendum, and from time to time thereafter as necessary, Tenant shall provide to the bank or company transferring funds (the "Funds Transferor") all directives necessary for said payments and the Tenant shall provide to the undersigned Landlord and its agent any documents and signatures necessary for Landlord to receive by electronic funds transfer, by not later than the first day of each month, the total of all monthly rent payments and other charges payable by Tenant under the attached Lease Agreement.

If, for any reason, Tenant's Funds Transferor fails to make or dishonors any payment or such payment is not in Landlord's account when due, Tenant understands that Tenant will be required to replace the payment within five (5) days of written notification with certified funds. Tenant will also pay all associated late fees, returned check fees and other charges.

This Addendum and the agreements contained in it shall remain in full force and effect until Tenant's lease with the Landlord for the apartment described in the attached Lease Agreement expires and all occupants have vacated the apartment.

If the first (1st) day of a calendar month falls on a weekend or holiday, the electronic funds transfer payment shall be made the following business day. In the event that rent or other charges are increased, as provided for in the Lease Agreement and after notice to Tenant of the increase, the payment shall for such increased rent or other charges as may be due. Tenant agrees to provide such further documents and authorizations and to take such further action as may be necessary to carry out (and to assist Landlord in carrying out) the purposes of this Addendum and the obligations of Tenant under this Addendum.

Address of Tenant(s): 5213 Wadsworth Court

Unit Number: 504

Tenants:

_____
Juan Carlos Escobar Amaroes, Tenant

_____
Virginia de Jesus Peña Penzueloe, Tenant

Jorge AF
_____
Jorge Armando Escobar Barrios, Tenant

_____
Reynaldo de Garcia Contreras, Tenant

Landlord:
Fairmont Residential, L.L.C.

By: JBG/Residential Management, L. L. C., its Agent

By: JBG/Chevy Chase Garden, L. L. C., its Managing Member

By: _____
Name: _____
Title:   Authorized Signatory

Last Updated: 01/12/2012

 The JBG Companies 

### FIRST AMENDMENT TO THE LEASE AGREEMENT

THIS FIRST AMENDMENT TO THE AGREEMENT OF LEASE made this November 11, 2014 by and between Fairmont Residential, L.L.C. ("Landlord", and Juan Carlos Escobar Barillas, Virginia de Jesus Pozuelos, Jorge Armando Escobar Barillas and Sara Judith Garcia Galdamez  (jointly and severally, "Tenant").

#### RECITALS

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement dated August 8, 2013 (the "Lease"), for certain residential premises known as Apartment 4213 Wadsworth Ct., Annandale, VA 22003 No. 4 at Fairmont Gardens, at 4137 Wadsworth Court, in Annandale, VA 22003.

WHEREAS, Landlord and Tenant desire to extend the term of the Lease as herein provided.

WHEREAS, Landlord and Tenant desire to amend the Lease as fully set forth herein.

#### COVENANTS

NOW THEREFORE, Landlord and Tenant agree as follows:

1. <u>Recitals</u>. The foregoing recitals are true and correct and are incorporated herein by this reference.

2. <u>Term</u>. The initial term of the Lease is extended for a period of 7 months and 0 days, said extension to begin on November 11, 2014 and to end on June 10, 2015 (extended term).

3. <u>Rent</u>.

   a.   Effective as of the first day of the extended term and continuing thereafter throughout the extended term, the rent shall be One Thousand Five Hundred Ten Dollars ($1510.00) per month. All other costs and charges payable by Tenant under the Lease, in addition to the aforesaid rent, shall continue to be payable by Tenant during the extension of the term.

   b.   Upon execution of this Amendment by Tenant, Tenant shall pay to Landlord an additional rent payment of One Hundred Fifty Dollars ($150.00) for use of common areas, common services and amenities during the aforesaid extension of the term of the Lease.

   c.   All other costs and charges payable by Tenant under the Lease, in addition to the aforesaid rent and additional rent, shall continue to be payable by Tenant during the aforesaid extension of the term.

4. <u>Ratification</u>.

   a.   Except as and only to the extent modified by the terms and provisions of this FIRST Amendment, all terms and provisions of the Lease are ratified and confirmed in all respects and shall hereby remain in full force and effect.

   b.   Nothing herein contained shall be deemed to waive Landlord's right, or Tenant's obligation, for payment of any sums accruing through and including the last day of the initial term.

   c.   Tenant hereby acknowledges that Landlord is not in default under the Lease as of the date hereof, and that Tenant is unaware of any conditions or circumstances which, but for the passage of time or delivery of notice, would constitute an event of default by Landlord under the Lease.

5. <u>Definitions</u>. Except as herein defined, all terms used in this FIRST Amendment shall have the same meaning as set forth in the Lease.

6. <u>Conflicts</u>. In the event of any conflict between the Lease and this FIRST Amendment, the terms of the FIRST Amendment shall control.

IN WITNESS WHEREOF, Landlord has caused this FIRST Amendment to Lease Agreement to be executed as of the day and year first above-written; and Tenant has executed this FIRST Amendment to Lease Agreement as of the day and year first above-written, intending to be legally bound hereby.

TENANTS:

_____
Juan Carlos Escobar Barillas

_____
Virginia de Jesus Peña Pozuelos

_____
Jorge Armando Escobar Barillas

_____
Sara Judith Garcia Galdamez

LANDLORD:

Fairmont Residential, L.L.C.

By:      JBG/Residential Manager III, L.L.C., its Agent

By:    JBG/Residential Manager III, L.L.C., its Managing Member

By:  *Joyce M. Recto*

Name:  *Joyce M. Recto*

Title: Authorized Signatory

Revised 6/16/14





The JBG Companies

**Pest Control Addendum**

THIS ADDENDUM is attached to and is part of the Lease dated January 1, 2015 , by and between Fairmont Residential, L.L.C. (hereafter called "Landlord"), and Juan Carlos Escobar Barillas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barillas and Sara Judith Garcia Galcamez (hereafter called "Tenant"), for Apartment 4213 Wadsworth Ct # 4 at 4137 Wadsworth Court, in Annandale, VA 22003 .

Landlord and Tenant further agree as follows:

1.     Tenant authorizes all exterminating technicians contracted by Landlord to enter Tenant's Apartment to inspect for pests or to perform pest control services in the event that Tenant is not home on the date and time that service is to be rendered.

2.     Tenant agrees that Tenant and Tenant's family members, occupants, guests and invitees will work in cooperation with Landlord and Landlord's pest control technicians to seek resolution of any pest control issues that may arise whether discovered by Tenant, the pest control technician and/or Landlord. Tenant will immediately notify Landlord of the presence of any pests that Tenant observes in Tenant's Apartment by contacting the Landlord's management office.

3.     Tenant further acknowledges that Tenant is responsible for the care and maintenance of Tenant's personal property and good housekeeping of Tenant's Apartment, in order to avoid and/or eradicate any pest infestation.

4.     Without limiting Tenant's obligations, Tenant agrees not to treat on Tenant's own Apartment for any bedbug infestation. Tenant must immediately notify Landlord of any known or suspected bedbug infestation or presence in the Apartment, or in any of Tenant's clothing, furniture or personal property.

5.     If on one (1) scheduled appointment for pest control treatment Tenant fails to prepare the Apartment as directed by Landlord or to provide access for such treatment, then the appointment will be re-scheduled for a second appointment and, in addition to being in default under the Lease, Tenant shall pay to Landlord $ ____ (as adjusted by Landlord if charges incurred by Landlord increase) for the treatment of the Apartment on such second scheduled appointment.

TENANTS:

Juan Carlos Escobar Barillas,

Virginia de Jesus Peña Pozuelos,

Jorge Armando Escobar Barillas,

and Sara Judith Garcia Galcamez

LANDLORD:

Fairmont Residential, L.L.C.

By:     JBG/Residential Manager III, L.L.C., its Agent

By:     JBG/Residential Manager III, L.L.C., its Managing Member

By:     Joyce N. Recto

Name:   Joyce N. Recto

Title: Authorized Signatory



THE JBG COMPANIES

#### FIRST AMENDMENT TO THE LEASE AGREEMENT

THIS FIRST AMENDMENT TO THE AGREEMENT OF LEASE made this November 11, 2014 by and between Fairmont Residential, L.L.C. ("Landlord"), and Juan Carlos Escobar Barillas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Barillas and Sara Judith Garcia Galdamez (jointly and severally, "Tenant").

#### RECITALS

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement dated August 9, 2013 (the "Lease"), for certain residential premises known as Apartment 4213 Wadsworth Ct., Annandale, VA 22003 No. 4 at Fairmont Gardens, at 4137 Wadsworth Court, in Annandale, VA 22003.

WHEREAS, Landlord and Tenant desire to extend the term of the Lease as herein provided.

WHEREAS, Landlord and Tenant desire to amend the Lease as fully set forth herein.

#### COVENANTS

NOW THEREFORE, Landlord and Tenant agree as follows:

1. Recitals. The foregoing recitals are true and correct and are incorporated herein by this reference.

2. Term. The initial term of the Lease is extended for a period of 7 months and 0 days, said extension to begin on November 11, 2014 and to end on June 10, 2015 (extended term).

3. Rent.

   a.  Effective as of the first day of the extended term and continuing thereafter throughout the extended term, the rent shall be One Thousand Five Hundred Ten Dollars ($1510.00) per month. All other costs and charges payable by Tenant under the Lease, in addition to the aforesaid rent, shall continue to be payable by Tenant during the extension of the term.

   b.  Upon execution of this Amendment by Tenant, Tenant shall pay to Landlord an additional rent payment of One Hundred Fifty Dollars ($150.00) for use of common areas, common services and amenities during the aforesaid extension of the term of the Lease.

   c.  All other costs and charges payable by Tenant under the Lease, in addition to the aforesaid rent and additional rent, shall continue to be payable by Tenant during the aforesaid extension of the term.

4. Ratification.

   a.  Except as and only to the extent modified by the terms and provisions of this FIRST Amendment, all terms and provisions of the Lease are ratified and confirmed in all respects and shall hereby remain in full force and effect.

   b.  Nothing herein contained shall be deemed to waive Landlord's right, or Tenant's obligation, for payment of any sums accruing through and including the last day of the initial term.

   c.  Tenant hereby acknowledges that Landlord is not in default under the Lease as of the date hereof, and that Tenant is unaware of any condition or circumstances which, but for the passage of time or delivery of notice, would constitute an event of default by Landlord under the Lease.

5. Definitions. Except as herein defined, all terms used in this FIRST Amendment shall have the same meaning as set forth in the Lease.

6. Conflicts. In the event of any conflict between the Lease and this FIRST Amendment, the terms of the FIRST Amendment shall control.

IN WITNESS WHEREOF, Landlord has caused this FIRST Amendment to Lease Agreement to be executed as of the day and year first above-written; and Tenant has executed the FIRST Amendment to Lease Agreement as of the day and year first above-written, intending to be legally bound hereby.

TENANT:

Juan Carlos Escobar Barillas

Virginia de Jesus Peña Pozuelos

Jorge Armando Escobar Barillas

Sara Judith Garcia Galdamez

LANDLORD:

Fairmont Residential L.L.C.

By:      JBG/Residential Manager III, L.L.C., its Agent

By:      JBG/Residential Manager III, L.L.C., its Managing Member

By:      Joyce N. Recto

Name:    Joyce N. Recto

Title: Authorized Signatory

Revised 5/15/14



The JBG Companies



**Pest Control Addendum**

THIS ADDENDUM is attached to and is part of the Lease dated January 1, 2015 , by and between Fairmont Residential, L.L.C. (hereafter called "Landlord"), and Juan Carlos Escobar Bariltas, Virginia de Jesus Peña Pozuelos, Jorge Armando Escobar Bariltas and Sara Judith Garcia Galdamez (hereafter called "Tenant"), for Apartment 4213 Wadsworth Ct # 4 at 4137 Wadsworth Court, in Annandale, VA 22003 .

Landlord and Tenant further agree as follows:

1.      Tenant authorizes all exterminating technicians contracted by Landlord to enter Tenant's Apartment to inspect for pests or to perform pest control services in the event that Tenant is not home on the date and time that service is to be rendered.

2.      Tenant agrees that Tenant and Tenant's family members, occupants, guests and invitees will work in cooperation with Landlord and Landlord's pest control technicians to seek resolution of any pest control issues that may arise whether discovered by Tenant, the pest control technician and/or Landlord. Tenant will immediately notify Landlord of the presence of any pests that Tenant observes in Tenant's Apartment by contacting the Landlord's management office.

3.      Tenant further acknowledges that Tenant is responsible for the care and maintenance of Tenant's personal property and good housekeeping of Tenant's Apartment, in order to avoid and/or eradicate any pest infestation.

4.      Without limiting Tenant's obligations, Tenant agrees not to treat on Tenant's own the Apartment for any bedbug infestation. Tenant must immediately notify Landlord of any known or suspected bedbug infestation or presence in the Apartment, or in any of Tenant's clothing, furniture or personal property.

5.      If on one (1) scheduled appointment for pest control treatment Tenant fails to prepare the Apartment as directed by Landlord or to provide access for such treatment, then the appointment will be re-scheduled for a second appointment and, in addition to being in default under the Lease, Tenant shall pay to Landlord $____ (as adjusted by Landlord if charges incurred by Landlord increase) for the treatment of the Apartment on such second scheduled appointment.

TENANTS:

_____
Juan Carlos Escobar Bariltas,

_____
Virginia de Jesus Peña Pozuelos,

_____
Jorge Armando Escobar Bariltas,

_____
and Sara Judith Garcia Galdamez

LANDLORD:

Fairmont Residential, L.L.C.

By:     JBG/Residential Manager III, L.L.C., its Agent

        By:   JBG/Residential Manager III, L.L.C., its Managing Member

        By:   _Joyce N. Recto_

        Name: _Joyce N. Recto_

        Title: Authorized Signatory





**Disclosure of Information on Lead Based Paint and/or Lead Based Paint Hazards**

**Lead Warning Statement:**

*Housing built before 1978 may contain lease based paint. Lead from paint, paint chips and dust can pose health hazards if not taken care of property. Lead exposure is especially harmful to young children and pregnant women. Before renting pre 1978 housing, lessors must disclose the presence of known lease based paint and lead based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure (Initial)**

(a) Presence of lead based paint or lead based paint hazards (check one below):

(i) _____ Known lease based paint and/or lead based paint hazards are present in the housing (explain)

(ii) _____ Lessor has no knowledge of lead based paint and/or lead based paint hazards in the housing.

(b) Records and Repairs available to the Landlord (check one below):

(i) _____ Lessor has provided the lessee with all available records and reports pertaining to lead to lead based paint and/or lead based paint hazards that are present in the housing (list documents below)

(ii) _____ Lessor has no reports pertaining to lead based paint and/or lead based paint hazards that are present in the housing.

**Lessee's Acknowledgement (Initial)**

(c) _____ Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Agent's Acknowledgment (Initial)**

(e) _____ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

TENANTS:

_____
Juan Carlos Escobar Barillas,

_____
Virginia de Jesus Peña Pozuelos,

_____
Jorge Armando Escobar Barillas

_____
and Flora Isabel Cuellar Saldamez

LANDLORD:

Fairmont Residential, L.L.C.

By:    JBG/Residential Manager III, L.L.C., its Agent

By:    JBG/Residential Manager III, L.L.C., its Managing Member

By: *Joyce N Recto*

Name: *Joyce N. Recto*

Title: Authorized Signatory